A. L. FARNSWORTH and ESPERANZA FARNSWORTH, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Farnsworth v. Commissioner
Docket Nos. 8267-71, 8268-71, 8269-71.
United States Tax Court
T.C. Memo 1973-195; 1973 Tax Ct. Memo LEXIS 92; 32 T.C.M. (CCH) 902; T.C.M. (RIA) 73195; September 4, 1973, Filed Larry R. Adamson and Richard C. Briney, for the petitioners. Wayne A. Smith, for the respondent. *93 FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following Federal income tax deficiencies against petitioners during the years in issue: 2 Additions to Tax Petitioner
Year
Deficiency
§6651(a)
§6653(a) A. L. & Esperanza Farnsworth
1966
$11,950.78
$1,792.64
$ 597.54
1967
47,449.10
none
2,372.45
Ralph C. & Wanda M. Farnsworth
1966
11,425.80
1,713.87
570.93
1967
192.51
none
9,62
E. D. & Lenna Farnsworth
1967
3,132.17
none
156.61
Petitioners have conceded on brief that the notices of deficiency issued to each of the petitioners for each of the years in issue were timely and that the applicable statutory period of limitations on assessment as governed by section 6501 of the Internal Revenue Code of 1954[2] had not expired at the time of issuance of these notices of deficiency. The issues remaining for disposition by this Court are: (1) whether petitioners have sustained their burden of proving that the deficiencies as determined by respondent *94 were invalid; (2) whether petitioners are liable for additions to tax under section 6653(a) on the grounds that their respective underpayment of tax was due to negligence or intentional disregard of rules and regulations; and (3) whether petitioners A. L. and Esperanza Farnsworth and Ralph C. and Wanda M. Farnsworth are liable for additions to tax under section 6651(a) for 1966 on the grounds that they willfully neglected to file timely Federal income tax returns in 1966. 3 FINDINGS OF FACT Some of the facts have been stipulated; the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. A. L. and Esperanza Farnsworth, husband and wife, resided in Nogales, Arizona, at the time they filed their petition herein. They filed joint Federal income tax returns for the years 1966 and 1967 with the district director of internal revenue for the District of Arizona. They filed their 1966 Federal income tax return on June 22, 1967. Ralph C. and Wanda M. Farnsworth, husband and wife, resided in Nogales, Arizona, at the time they filed their petition herein. They filed joint Federal income tax returns for the years 1966 and 1967 with the *95 district director of internal revenue for the District of Arizona. They filed their 1966 Federal income tax return on June 10, 1967.
E. D. and Lenna Farnsworth, husband and wife, resided in Nogales, Arizona, at the time they filed their petition herein. They filed a joint Federal income tax return for the year 1967 with the district director of internal revenue for the District of Arizona. During the year 1966 A. L. Farnsworth ("A. L.") and Ralph C. Farnsworth ("Ralph") were equal sole partners in Richt-Renoir Fine Crafts ("Richt-Renoir").During the year 1967 A. L. and E. D. Farnsworth ("E. D.") were the 4 sole partners in Richt-Renoir. Eighty-two percent of Richt-Renoir's net income for 1967 was distributed to A. L. and the remaining 18 percent was distributed to E. D. Esperanza Farnsworth, A. L.'s wife; Wanda Farnsworth, Ralph's wife; and Lenna Farnsworth, E. D.'s wife, were not connected with any of Richt-Renoir's partnership business and are petitioners herein only by reason of filing joint income tax returns with their respective husbands. Accordingly, collective references hereinafter to petitioners will be to A. L. and Ralph for the year 1966 and A. L., Ralph, *96 and E. D. for the year 1967. Richt-Renoir's business operations in 1966 and 1967 consisted of the importation into Mexico of such luxury consumer items as liquor and cigarettes, and the exportation out of Mexico of silver. Richt-Renoir avoided paying the import duty imposed by the Mexican government during 1966 and 1967 on liquor and cigarettes by flying the goods to secret airstrips in the interior of Mexico. Richt-Renoir avoided paying the duty imposed by the Mexican government on silver exported from Mexico during 1966 and 1967 by flying the silver from secret airstrips in the interior of Mexico to Nogales, Arizona. Richt-Renoir's Mexican liquor enterprise for 1966 and 1967 operated as follows: 5 Richt-Renoir would receive a telephone order for liquor from one of Richt-Renoir's Mexican connections. Richt-Renoir would buy the liquor from one of its Arizona wholesale liquor contacts. The liquor would then be transported by truck to the Nogales airport where it would be loaded on planes owned and operated by Richt-Renoir. The planes would leave the Nogales airport and fly to one of several unimproved landing strips in the vicinity of Hermosillo, Mexico. The planes *97 would be met and unloaded by employees of the partnership. The liquor would then be taken to a warehouse where a portion would be repackaged for shipment by trucks to points further south in Mexico. The remainder of the liquor would be delivered to Hector Pina for ultimate sale by him of the liquor. The portion which had been repackaged for shipment south would be loaded on trucks owned by Isaac Rocha. Rocha was paid $2 per case for delivering the liquor to Obregon and Culiacan, Mexico. The price for delivery to Guadalajara and Mexico City, Mexico, was $2.80 and $4.00 per case, respectively. Richt-Renoir was responsible for delivering the following approximate numbers of cases of liquor to the indicated Mexican cities during the years in issue: 6 Number of Cases City
1966
1967 Hermosillo
1,000- 1,500
1,500- 1,700
Obregon & Culiacan
3,000- 3,200
2,000- 2,500
Guadalajara
3,000- 3,500
3,000- 3,500
Mexico City
3,000- 3,500
3,500- 4,000
Total
10,000-11,700
10,000-11,700
Neither Richt-Renoir nor its respective partners kept a precise record of the number of cases of liquor which were delivered by Richt-Renoir to the various Mexican *98 cities during 1966 and/or 1967. A. L. informed Tunis Parsons, Richt-Renoir's accountant for 1966 and 1967, that Richt-Renoir's "net" profit from its liquor operations for 1966 and 1967 was $4 per case. Richt-Renoir maintained no records for either 1966 or 1967 that would substantiate this "net" income per case of liquor computation. Richt-Renoir reported net partnership income from all of its partnership operations for the taxable years 1966 and 1967 in the amounts of $24,259.78 and $41,446.09, respectively. Richt-Renoir operated approximately 300 flights each in 1966 and 1967 for purposes of delivering liquor and other consumer luxury items (i.e., cloth and cigarettes) to Mexico. Only approximately 25 percent of these return flights (i.e., 75) were utilized by Richt-Renoir for purposes of exporting silver out of Mexico. The substantial majority of all of 7 Richt-Renoir's overall flights to Mexico (i.e., at least 75 percent) were utilized for Richt-Renoir's liquor operations. Richt-Renoir paid its pilots an average of $25 per hour for the flights conducted during 1966 and 1967. The average aggregate flight time for Richt-Renoir's flights to and from Mexico in 1966 *99 and 1967 was approximately 2 hours. Richt-Renoir's partnership Federal income tax return for 1966 reflected the following income and expense schedules: Gross Income
Silver
$2,132,743.41
Whiskey (net)
40,596.00
Cloth
7,062.50
Cigarettes
900.00
$2,181,301.91
Cost of Sales
Silver
$1,962,005.37
Cigarettes
867.40
$1,962,872.77
Other Deductions
Contract Flying
$25,078.74
Contract Trucking
10,068.28
Secretarial Services
2,320.00
Refining Charges
87,698.97
Mining Expenses
5,600.00
Customs
3,305.72
Brokerage
3,487.50
Insurance
803.88
Telephone
9,383.65
Legal & Accounting
760.00
Airplane Lease
26,541.46
Gas, Oil, Maintenance
2,858.08
Travel & Entertainment
853.15
Miscellaneous
829.91
$179,589.34 8 Richt-Renoir's partnership Federal income tax return for 1967 reflected the following income and expense schedules: Gross Income
Silver
$2,738,294.64
Whiskey
222,069.00
Cloth
28,025.00
Cigarettes & Other
1,121.00
$2,989,509.64
Cost of Sales
Silver
$2,493,577.41
Cigarettes & Other
106.40
$2,493,683.81
Other
Refining Charges
$95,583.21
Contract Flying
20,507.44
Contract Trucking
169,469.44
Loading & Shipping Costs
5,660.96
Gas, Oil, Maintenance
61,937.79
Customs
2,865.28
Brokerage
7,878.54
Insurance
4,244.43
Telephone
7,100.45
Office, Postage, Misc.
1,031.96
Travel & Entertainment
1,130.01
Mining Expenses
14,623.04
$392,032.55
*100 Isaac Cherem ("Cherem"), who is now deceased, and Alfonso Cuevas ("Cuevas") acquired silver in Mexico City pursuant to the operation of two money exchange houses owned by Cherem and Cuevas during the years in issue. Upon the accumulation of specified quantities of silver, Cherem and Cuevas would ship the silver to Hermosillo. They would telephone petitioners and advise them as to when the shipment would arrive, the composition of the shipment, and the 9 "silver venture silver "cost"." The silver was loaded aboard Richt-Renoir's planes at remote airstrips near Hermosillo and flown to Nogales. The silver was examined by U.S. Customs officials and the U.S. Customs officials issued a "release" for the silver shipment. The silver shipment was boxed and then transported to Tucson International Airport and shipped, freight collect, by common carrier to a domestic refinery in the United States, usually Englehart Industries ("Englehart") in Newark, New Jersey. On the day the silver was shipped to Englehart, A. L. would prepare a sales invoice to Englehart with the amount constituting the computed pure silver quantity times the world market price of silver on that day. On the same *101 day, A. L. would write a bank draft on Englehart for 90 percent of the invoice price. A. L. would then write a partnership check to the bank and have the bank wire Cherem or Cuevas a certain amount, this amount being the "silver venture silver "cost"." Five to 20 days later Englehart would send a "liquidation check" for the balance due on the particular shipment. The balance due was computed as follows (the number representing a hypothetical transaction): 10 Weight of pure silver, after refining, times world market price of silver on date received
$73,000.00
Less collect freight paid and refining charge
3,000.00
Net
$70,000.00
Less amount of the 90% bank draft written by A. L.
65,700.00
Liquidation check
$4,300.00
A. L., Cherem, and Cuevas agreed among themselves that the cost of delivering the silver to Hermosillo was $1,161. They further agreed that Cherem and Cuevas would be reimbursed for the full amount of the $1,161 delivery cost. If the actual delivery cost was less than, or more than, $1,161, the resultant savings or losses would be shared only by Cherem and Cuevas. There were different prices for silver on the world market, on the retail *102 market in Mexico, and in the wholesale market in Mexico. A hypothetical example of these price differences would be as follows: World market price
$1.29 per ounce
Mexico standard price (the price at which the large money exchange houses sold silver)
1.00 per ounce
Mexico's consumer price (the price at which silver was purchased from the public by the money exchange houses)
0.90 per ounce
Mexico's standard price or the price at which silver was sold by the money exchange houses was a price set by 11 Baron's, which is the largest money exchange house in Mexico. In the computations of the division of profits between petitioners and Cherem and Cuevas, the "cost of silver" used was that price established by Baron's, that is, the price at which Baron's sold silver, or $1 per ounce in the above example. The "profit or loss" on each silver shipment was divided equally between Cherem, Cuevas, A. L., and Ralph in 1966, and equally between Cherem, Cuevas, and A. L. in 1967. (A. L.'s share in reality constituted Richt-Renoir's share in 1967.) The profit or loss on each silver shipment was computed in the following manner (the amounts being a hypothetical transaction): *103 Bank draft (for 90% of invoice, e.g., 90% X $73,000)
$65,700
Liquidation check
4,300
Total proceeds
$70,000
Silver venture "cost"
$60,000
Agreed charge
1,161
61,161
Net profit
$8,839
Profit to each partner (1967) ($8,839 3)
$2,946
The timing of a typical silver venture transaction is illustrated by the following hypothetical model: 12 Feb. 9 Cherem buys silver for $60,000 Cherem pays money exchange house $60,000 cash 10 Cherem ships the $60,000 of silver to A. L. near Hermosillo 12 A. L. receives the $60,000 shipment A. L. air transports shipment from near Hermosillo to Nogales U.S. Customs examines shipment and issues a customs "release" A. L. delivers silver to American Airlines in Tucson for transport to New Jersey
Englehart picks up silver in New Jersey
12 or 13 A. L. wirtes draft on Englehart for 90% of price expected to be paid by Englehart ($73,000 X 90%, or $65,700) and deposits same in Richt-Renoir's bank account A. L. writes partnership check for $60,000, payable to Southern Arizona Bank, for transfer to Cherem's account in a bank in Mexico City, to pay cherem for his silver "cost" 14 Cherem receives *104 money from his bank in Mexico City 17 A. L. receives liquidation check from Englehart for $4,300, computed as follows: Value of pure silver on date of receipt
$73,000
C.O.D. charge and refining charge
(3,000)
Draft
(65,700)
Liquidation check
$4,300 13 Mar. 25 Cherem to Nogales
Cherem and A. L. approve settlement of $2,946 to each partner A. L. writes $2,946 check to Cherem and to Cuevas (in fact, several shipments may be settled at one time and one check would, therefore, be written to each partner for aggregate amount resulting from the component shipments) Richt-Renoir deducted $15,000 in 1967. Although the $15,000 was characterized as a gas, oil and/or maintenance expenditure, the $15,000 in reality was expended as a downpayment on an Aztec airplane purchased by Richt-Renoir and, thus, should properly have been reflected as a capital expenditure. Ivan W. Horne ("Horne"), the revenue agent who conducted the audit in the instant case, prepared a statement in 1969 detailing his understanding of Richt-Renoir's operations. Horne presented this statement to A. L. on May 12, 1969. After reading the statement and suggesting some changes, A. *105 L. signed the statement. A. L. signed the statement due to his fear that Horne would be further antagonized by his refusal to do so. A. L. and Ralph rationalized the late filing of their respective Federal income tax returns for 1966 as resulting from the lack of availability of requisite information. No 14 data was supplied either as to the nature of this information or as to why the information was not obtained prior to its ostensible availability. Respondent in his notices of deficiency dated September 17, 1971, determined that Richt-Renoir had understated its net partnership income for 1966 and 1967 in the amounts of $182,047.42 and $202,961.91, respectively. The exhibits attached thereto indicated that the respective deficiencies reflected adjustments based partially on a bank deposits analysis and partially on the theory that purported illegal bribes paid to Mexican government officials were in effect erroneously deducted from Richt-Renoir's gross liquor income during the years in issue. ULTIMATE FINDINGS OF FACT The payment of the purported bribes to Mexican officials during the years in issue with respect to Richt-Renoir's operations in Mexico was made by *106 independent contracters and not by Richt-Renoir's agents or employees. Richt-Renoir had net income during the years in issue of $90,451.42 in 1966 and $99,961.91 in 1967. Since Richt-Renoir reported net income on its partnership tax returns for 1966 and 1967 in the respective amounts of $24,259.78 and $41,446.09, Richt-Renoir understated its net income for both 1966 and 1967 in the amounts of $66,191.64 and $58,515.82, respectively. 15 OPINION Petitioners and respondent have directed the primary focus of their arguments at trial and on brief to the bribery issue. Petitioners contend that respondent has not sustained his burden under section 162(c) (1) of proving that petitioners directly or indirectly made bribery payments during the years in issue to Mexican government officials that would be illegal under the laws of the United States. Respondent contends that he has satisfied the burden of proof imposed by section 162(c) (1) and further contends that petitioners in effect erroneously deducted the alleged bribes by excluding them from the computation of the net income derived from Richt-Renoir's Mexican liquor operations. After carefully reviewing the record in *107 this proceeding, we have concluded that regardless of which party had the burden of proof with respect to the bribery issue, the evidence introduced at trial clearly establishes that the portion of the deficiency determination that resulted from Richt-Renoir's purported payment of bribes to Mexican officials is inaccurate. We recognize the the statement prepared by Horne was signed by A. L. on May 12, 1969, and that this statement contains admissions by A. L. inferring that Richt-Renoir did authorize the payment of the purported bribes by its alleged agents or employees. However, these admissions are not 16 judicially conclusive, but, to the contrary, are only one of the evidentiary factors to be considered in resolving the bribery issue. See Corpus Juris Secundum, Evidence, § 270, p. 695. A. L.'s testimony, as corroborated by the testimony of a multitude of witnesses at trial, has convinced us that any bribes that were made to Mexican officials in connection with Richt-Renoir's Mexican operations were made by independent contractors and not by Richt-Renoir's agents or employees. Moreover, we are satisfied that the statement signed by A. L. on May 12, 1969, should properly *108 be given only minimal consideration due to the circumstances surrounding its preparation by Horne and its signature by A. L. A. L. was cognizant that Horne was already antagonized by the difficulties he had encountered in attempting to clarify the extent of Richt-Renoir's Mexican operations. A. L. realized that the statement prepared by Horne inaccurately inferred that Richt-Renoir paid bribes to Mexican officials through its agents or employees. However, since he believed that these bribes were deductible in any event, and since he was afraid that his refusal to sign the statement would be detrimental to Richt-Renoir's and his interests by inducing further antagonism on Horne's part, A. L. did ultimately sign the statement. 17 Although petitioners have negated respondent's theory that part of the deficiency resulted from Richt-Renoir's purported payment of bribes, petitioners have not negated the apparent inferences existing in the record that Richt-Renoir did understate its partnership income for 1966 and 1967. For example, a schedule attached to Richt-Renoir's partnership return for 1966 reflected that Richt-Renoir received approximately $41,000 of its net income [3] from *109 its 1966 Mexican liquor operations. However, this same schedule also stated that Richt-Renoir incurred the following approximate expenses in 1966: $25,000 for contract flying; $10,000 for contract trucking; $26,500 for airplane leasing; and $3,000 for gas, oil and maintenance. The record reflects that Richt-Renoir operated approximately 300 flights to Mexico during each of the years in issue for purposes of delivering liquor and other consumer luxury items and that the substantial majority of these trips were for the delivery of liquor to Richt-Renoir's Mexican connections. The record further reflects that only approximately 25 percent of the return flights to the 18 United States were utilized by Richt-Renoir for purposes of exporting silver out of Mexico. Accordingly, since the substantial majority of Richt-Renoir's flights to Mexico during 1966 and 1967 were utilized for Richt-Renoir's Mexican liquor operations, a pro rata portion of the contract flying, contract trucking, airplane leasing, and gas, oil and maintenance expenses (the airplane and truck expenses) for these years should properly have been allocated to the liquor operations. Nevertheless, although the 1966 *110 schedule reflects that the liquor income is included at its net figure, the evidence certainly suggests that the airplane and truck expenses reflected on the 1966 schedule also included the portion of airplane and truck expenses that were allocable to Richt-Renoir's Mexican liquor operations. [4]
*111 19 This analysis lead to the inexorable conclusion that Richt-Renoir derived a double deduction in 1966 for the pro rata portion of the airplane and truck expenses allocable to its Mexican liquor operations; i.e., the contract flying and contract trucking expenses were deducted both in the computation of Richt-Renoir's net liquor income and in the separate computation of Richt-Renoir's net income from its total operations (including its liquor operations). Accordingly, Richt-Renoir's taxable income for 1966 would have been understated at least to the extent of the benefit derived from the double deductions taken for the pertinent airplane and truck expense items. With respect to 1967, the schedule attached to Richt-Renoir's 1967 partnership Federal income tax return reflects that Richt-Renoir incurred contract trucking expenses for 20 1967 in the amount of approximately $169,500. Again, since the record gives us no basis to assume otherwise, we can only conclude that most (if not all) of the amount is properly allocable to Richt-Renoir's liquor operations. Yet, in attempting to corroborate the validity of the total amount claimed as contract trucking expenses, we are *112 confronted with a patent inconsistency. A. L. testified at trial that Richt-Renoir paid varying rates to Rocha for Rocha's transporting the liquor from Hermosillo to Obregon, Culiacan, Guadalajara and Mexico City. A. L. further testified (1) that Richt-Renoir imported approximately 10,000-11,700 cases of liquor into Mexico in 1967 and (2) that Rocha's highest rate for delivery of liquor from Hermosillo was the $4 per case rate charged for delivery of liquor to Mexico City (i.e., Mexico City was further in distance from Hermosillo than Obregon, Culiacan or Guadalajara). Even if we were to assume (and this assumption is patently invalid) that all of the maximum 11,700 cases of liquor imported by Richt-Renoir into Mexico in 1967 were delivered by Rocha to Mexico City, the total contract trucking expense would have been $46,800. This amount is approximately $122,600 less than the amount claimed by Richt-Renoir as contract trucking expenses for 1967. Since Richt-Renoir did not maintain adequate books and records regarding its liquor operations for 1967, and since there 21 is no evidence in the record that would permit substantiation of the amount claimed for 1967 as contract trucking *113 expenses, we can only conclude that this item was greatly overstated and that Richt-Renoir's resultant net income from its liquor operations for 1967 was therefore greatly understated. Moreover, our conclusion with respect to 1967 is further supported by the fact that Richt-Renoir claimed on its 1967 partnership return a $15,000 item within the category of gas, oil and maintenance expenses. Petitioners' accountant conceded at trial that this $15,000 in actuality was expended for the purchase of an airplane and that it should properly have been capitalized rather than deducted as a current expenditure. Although Richt-Renoir would be entitled to a depreciation deduction for the acquired airplane, the amount of the deduction would still be far less than the full $15,0000 that was taken as a current expense. Thus, the erroneous treatment of this item further contributed to the understatement of Richt-Renoir's income for 1967. Accordingly, after considering that Richt-Renoir maintained no records with respect to its Mexican liquor operations for 1966 and 1967 and that petitioners have not dispelled the unexplained discrepancies existing in the record itself, we have found, and so *114 hold, that Richt-Renoir's actual net income for 1966 and 1967 was $90,451.42 and $99,961.91, respectively, and that, to the extent reflected 22 by comparing these amounts with the amounts reported by Richt-Renoir as net income on its partnership tax returns for 1966 and 1967, Richt-Renoir did understate its income for 1966 and 1967 in the respective amounts of $66,191.64 and $58,515.82. See Welch v. Helvering, 290 U.S. 111 (1933); and Geiger v. Commissioner, 440 F.2d 688 (C.A. 9, 1971), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 404 U.S. 851 (1971). Respondent further determined that petitioners are liable for the years in issue for additions to tax under section 6653(a), which provides that If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.
Respondent asserts that *115 section 6001 and section 1.6001-1, Income Tax Regs., require the taxpayer to keep adequate books and records for the purpose of reflecting taxable income. In this context, respondent contends that petitioners negligently or intentionally failed to comply with this requirement for the years in issue. Petitioners have the burden of proving that respondent erred in his determination. See J. T. S. Brown's Son Co., 10 T.C. 840 (1948); and Elsie SoRelle, 22 T.C. 459 (1954). Petitioners in the instant case maintained no records whatsoever during the years in issue with respect to Richt-Renoir's Mexican liquor operations. Moreover, petitioners offered no credible justification for failing to maintain 23 such records. Accordingly, we sustain respondent's section 6653(a) determinations for 1966 and 1967. [5]
Finally, respondent determined that petitioners *116 A. L. and Esperanza, and Ralph and Wanda, are liable for additions to tax under section 6651(a) for failure to timely file their respective joint Federal income tax returns for the taxable year 1966. Petitioners contend that the involved 1966 tax returns were filed late because certain partnership information was not timely available. Petitioners have made no attempt to explain either what partnership information was involved or why this information was not available for timely filing of their 1966 tax returns. Therefore, we are compelled to conclude that petitioners have not satisfied their burden of proving that the failure to timely file their 1966 returns was attributable to reasonable cause and was not due to willful neglect. See C. Fink Fischer, 50 T.C. 164, 177 (1968). Accordingly, respondent's section 6651(a) determinations for 1966 are sustained. Decisions will be entered under Rule 50. Footnotes
1. The cases of the following petitioners are consolidated herein: E. D. Farnsworth and Lenna Farnsworth, Docket No. 8268-71; and Ralph C. Farnsworth and Wanda M. Farnsworth, Docket No. 8269-71. ↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise indicated. ↩
3. Richt-Renoir maintained no records for its Mexican liquor operations for 1966 and 1967. In computing Richt-Renoir's income from the liquor operations for Federal income tax purposes, A. L. simply reported the net income from Richt-Renoir's liquor business. Due to the lack of records, A. L. was unable to substantiate with precision either the gross income from the liquor operations or the actual expenses incurred in this business. ↩
4. It is inconceivable that we could conclude otherwise. Even if we assumed that 25 percent of Richt-Renoir's Mexican flight operations were utilized exclusively for importation of nonliquor consumer items into Mexico and for exportation of silver out of Mexico, this would yield only an approximate figure of 75 flights (i.e., 25% X 300 approximate flights). In this context, the allocation of the aggregate $25,000 contract flying expense for 1966 to only 75 flights appears grossly unreasonable, since this would amount to approximately $334 per flight. The unreasonableness of this computation is apparent when we consider A. L.'s testimony at trial that each flight took approximately 2 hours of total flight time and that the pilot's wages averaged $25 per hour. Even if we were to assume that each flight averaged 4 hours instead of the 2 hours, the contract flying cost of each of the 75 exclusively nonliquor flights should still be only approximately $100 (4 hours flight time X $25 per hour) and not $334. The same conclusion would also apply to the contract trucking expenses indicated in the 1966 schedule. The record reflects no evidence that contract trucking expenses were incurred in Richt-Renoir's silver operations. Although Cherem and Cuevas did sustain trucking expenses in delivering the silver to Hermosillo for pick up by Richt-Renoir, A. L.'s and Cuevas' testimony at trial asserted that this expense was solely that of Cherem and Cuevas and was not an expense incurred by Richt-Renoir. Moreover, since the income indicated on the 1966 schedule as being derived from Richt-Renoir's nonliquor and nonsilver operations is negligible (i.e., approximately $7,000 from cloth and $900 from cigarettes) there is no basis in the record for assuming that all of the contract trucking expense should be allocated to Richt-Renoir's cloth and cigarettes operations. Thus, as with respect to the contract flying item, we can only conclude that a substantial portion of the contract trucking expenses were deducted twice, i.e., in the computation of Richt-Renoir's net liquor income and in the separate computation of Richt-Renoir's net from total operations (including its liquor operations). ↩
5. In any event, Richt-Renoir's erroneous characterization of the $15,000 expended for airplanes in 1967 as an oil, gas and/or maintenance expense constituted sufficient negligence or intentional disregard of the rules to sustain the sec. 6653(a)↩ determination for 1967.