*Decisions will be entered under Rule 50.*

## C. FINK FISCHER AND JEAN FISCHER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 990–66.   Filed April 29, 1968.

C. Fink Fischer, pro se.
*Owen A. Knopping*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' joint Federal income tax returns for 1960–62, and additions to tax for those years under section 6651(a), I.R.C. of 1954,[1] as follows:

| Year | Deficiency | Addition to tax sec. 6651(a) |
| --- | --- | --- |
| 1960 | $534. 59 | $55. 67 |
| 1961 | 750. 14 | 23. 15 |
| 1962 | 3, 303. 72 | 145. 48 |

The issues presented for decision are: (1) Whether petitioners, under Code section 162, are entitled to deduct in the years 1960 to 1962,

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

inclusive, depreciation and other expenses related to the ownership of an airplane; (2) whether amounts paid by petitioners in 1961 and 1962 in connection with their son's attendance at Oxford Academy are deductible as medical expenses under section 213; and, (3) whether delinquency penalties under section 6651(a) for taxable years 1960 to 1962, inclusive, were properly imposed.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits thereto are incorporated herein by this reference.

C. Fink Fischer and Jean B. Fischer, husband and wife, were residents of Princeton, N.J., at the date of the filing of the petition in this case. They filed joint Federal income tax returns for the taxable years 1960, 1961, and 1962 with the district director of internal revenue, Camden, N.J. Jean B. Fischer is a petitioner herein solely by reason of having filed a joint return. C. Fink Fischer will hereinafter be referred to as petitioner.

*Issue 1*

Petitioner is a retired commander in the U.S. Navy, having been statutorily retired in June 1960. Immediately after his retirement, in July 1960, petitioner commenced earning fees as a business and engineering consultant. By August 22, 1960, these fees, which were reported on his 1960 income tax return, totaled $990. On August 22, 1960, petitioner, as president, and two other individuals founded Stony Brook Laboratories, Inc., a corporation through which his services as a business and engineering consultant continued.

After retirement from the U.S. Navy, the petitioner devoted his time exclusively during the taxable years 1960 to 1962, inclusive, as a business and engineering consultant.

In February 1960, while still on active duty, petitioner purchased a 1949-built Cessna 195 aircraft for the sum of $9,425.

Petitioner reported receipts from aircraft operation for the taxable year 1960 of a $225 charter fee and expenses in the operation of the aircraft in the amount of $2,224.15. The difference between these figures resulted in a loss claimed by petitioner as a deduction in his return for the taxable year 1960. In explanation thereof, petitioner stated that the Cessna was purchased in anticipation of his retirement as a U.S. Naval aviator to provide a tool for continuance of his trade as an aviator and aeronautical engineer; its use for these purposes and in support of prior-mentioned business activity during 1960 was minimal.

Petitioner reported on Schedule B of his 1961 Federal income tax return a loss from aircraft operation of $3,214.63. In explaining this loss petitioner stated that the aircraft was purchased in anticipation of his retirement as a U.S. Naval aviator to provide a tool for continuance

of his trade as an aviator and aeronautical engineer and the aircraft had no use during the year except for minimum flight maintenance time.

In explaining a loss of $2,645.75 on Schedule C of his 1962 Federal income tax return, petitioner reported the following information: "Cessna 195 Aircraft purchased February, 1960 for charter operation. In storage during year 1962."

Petitioner did not advertise nor did he hold himself out as being in the business of chartering aircraft.

### *Issue 2*

Don Hadley Fischer (hereinafter referred to as Don) is petitioner's son by a former marriage. When Don was about 6 or 8 years old his parents were divorced. Don first lived with his mother, but after her remarriage and subsequent divorce he came to live with his father who had remarried. When Don was 6 he entered the Princeton Country Day School. At that time it was discovered that he suffered from hearing and vision troubles which seriously impaired his reading assimilation. At the same time, Don began to give evidence of emotional problems which further hindered his ability to accommodate himself to the school environment. At the age of 12 Don left the Princeton Country Day School and entered the Hun School of Princeton, N.J., as a day student.

Don's failure pattern became complete at the Hun School, and petitioner finally sought advice from the headmaster of that school as to the cause of the trouble and possible corrective measures. At that time Don was 17 years old and still in the ninth grade. It was recommended that Don be given a psychological examination. As a consequence of this recommendation, petitioner took Don to the Psychological Service of the Pennsylvania Institute, Pennsylvania Hospital, Philadelphia (hereinafter referred to as the institute), where he was tested and examined by the staff for the purpose of determining the nature of his difficulties. E. Gillet Ketchum, supervisor of reeducation for the institute, reported to petitioner that intellectually Don tested in the high average to moderately superior classification in relation to his age, but that he suffered from a number of emotional problems:

The analysis indicates Donald to have a very weak ego. He has not evolved the usual "defense" or integrating mechanisms necessary for dealing maturely, realistically and in an organized fashion, with the problems of his environment. It would be his tendency, because of these weaknesses, which Donald vaguely senses, to withdraw from facing and dealing with stress, with frustration. Initially, the boy would tend to withdraw into his own inner self, into fantasies and day dreams. Continuous difficulties in concentration and in organization would be present at such times. When the environment's pressures and

demands become so insistent that this form of withdrawal is not effective, then Donald may "panic" and attempt to remove himself from these pressures physically by running away. This is an ego organization which makes Donald extremely sensitive, intuitive as an individual. It is one which fosters his preference for intuitive rather than for logical reasoning. It is also one which inclines the boy towards pseudo self sufficiency. It makes him really hard to reach. It fosters difficulties in self expression and self insight. It is an immature status and its continuance could lead Donald towards serious and chronic maladjustment, a state of chronic inability to deal with reality, with consequent failure to realize his potentialities, to be always on the fringe of success in both practical and social relationships.

Ketchum concluded that Don was in need of psychological help, in the nature of "consistent, sensitive, slow paced psychotherapy," and suggested Nathaniel Boonin (hereinafter referred to as Boonin), a psychiatrist with offices in Princeton, N.J.

Don was first examined by Boonin in August 1960. Boonin found him to be a sincere and well-motivated boy who had significant neurotic blocks against learning. After treating Don for over a year, Boonin advised petitioner that psychotherapy had resulted in only partial improvement and optimum treatment required placing Don away from home in a school which could tailor-make a program to fit his highly individual needs. Boonin thought that an institution designed solely for psychiatric patients would have a regressive effect on Don, and recommended three schools, one of which was the Oxford Academy of Pleasantville, N.J.

After investigation of the recommended schools, petitioner decided upon the Oxford Academy (sometimes referred to below as the academy). Boonin then wrote a letter of referral to Edward R. Knight, headmaster of the school, in which he stated he was referring his patient, Don Fischer, to the academy in the expectation that a proper "therapeutic-educational program" for him could be developed. The letter further stated that "the psychological effects of responding to * * * [a tailormade educational program] by beginning to experience success in the academic field, which for him is so highly charged with significance, will do more for Don at this stage than further psychotherapy." Boonin further stated that he thought Oxford Academy would "provide Don with the optimum therapeutic milieu in which to effect his recovery."

The Oxford Academy is a small, private, boarding school specializing in handling of boys of normal intelligence who have failed to achieve success in other schools, primarily because of mental or emotional problems. It is a "referral school" in the sense that boys with academic, emotional, psychological, and psychiatric problems are referred to it by psychologists, psychiatrists, and educators for handling. The academy does not accept boys who have such severe emotional problems as psychosis or who are mentally retarded. It accepts only

boys who, in the opinion of the headmaster, will respond to a highly structured environment and close psychological surveillance and eventually will be able to adjust to traditional educational institutions. The principal objective of the academy is to help the boys make such an adjustment. The younger boys who leave the academy usually return to public or private preparatory schools; most of the older ones who have successfully completed the required courses enter college.

The academy has no school year, no classes and no graduation exercise in the traditional sense. Boys are admitted from a waiting list as vacancies occur and, excepting short vacations, stay at the academy 12 months of the year. They are taught individually and begin their courses of study at the level they are able to work regardless of their age or their classification in the school system in which they previously have been enrolled. When a boy leaves the academy, a certificate is issued showing the courses of study which he has completed.

Teaching is directed not only toward the correction of academic deficiencies; it is also an important element of the therapeutic process. Teacher assignments are made on the basis of a judgment by the head-master as to the emotional and educational needs of the boy at the particular time. For boys needing more intensive handling (not more than six or seven boys out of the total enrollment at any one time) the academy maintains a program of psychotherapy on a regular basis, provided by the headmaster. Other staff members also counsel the boys on extraacademic problems.

The headmaster of Oxford Academy, Edward R. Knight, is a fellow of the American Psychological Association, School Psychologists Division. He holds M.A. and Ph. D. degrees in psychology, and is certified by the State of New Jersey. During the years in issue, the academy had a staff of 13 or 14, and an enrollment of 39, compared with an enrollment of 250 to 300 students in other private schools with a faculty of this size. Most members of the staff have had substantial formal training in psychology, and all members of the staff have had intensive in-service training over a period of several years while at the academy.

Although Don was accepted by the Oxford Academy in September 1961, he was not admitted until February of the following year when he was reached on the waiting list. At that time Don was 19 years of age, and approximately 5 or 6 years behind his age group academically. After thorough testing, Knight found Don's problems to be deep-rooted and severe, much more severe than those of the average boy at the academy. Although he had above-average intelligence, he had neurotic blocks against learning. He was immature, self-centered, shortsighted, impulsive, tense, and given to excessive fantasy, day-

dreaming, and self deprecation. He had a very weak ego, leading to an inability to deal maturely with the problems of his environment.

Don manifested his mental and emotional problems in a variety of ways. Each day there was some problem, some crisis. He was very tense, nervous, and hyperactive. He could not sit still or concentrate except for limited periods of time and this frequently caused conflicts. His problems were not simply disciplinary; indeed, he was welcome to return to the Hun School.

Don's way of dealing with his problems was to appear to be completely indifferent to his environment, but Knight's analysis disclosed that Don worried excessively about his failures. He often suffered from insomnia. When he finally fell asleep at night, he was frequently awakened by frightening nightmares. Knight's analysis disclosed that Don also suffered from a great fear of death. His reactions to the situations which he faced were emotional or impulsive without regard for the ultimate consequences.

Based upon records obtained from schools previously attended by Don, information obtained from Ketchum and Boonin, extensive testing at the academy, and Knight's sessions with Don, an individualized program for him was developed. During Don's entire stay at the academy, Knight personally provided both supportive and reconstructive psychotherapy on a daily basis. The psychotherapy was designed to enable Don to understand his problems, to understand why he had reacted to his life situations as he had, and to give him insight into his relations with other people. Knight taught Don no courses of study. Other members of the staff under Knight's direction also counseled Don almost daily on extraacademic matters. With a view to restoring Don's ego, teaching situations were created in which he could succeed. Frequent conferences were held by Knight with all staff members dealing with Don to plan each step of his program which was designed to get him readjusted emotionally, socially, and academically to the point where he could proceed with his education in a traditional environment and take his normal place in society.

Don remained at the academy until June 1963, at which time the academy issued a certificate showing that he had completed a course of study substantially equivalent to that given in the public high schools of New Jersey. In September 1963 he entered Mexico City College and later served 3 years in the U.S. Army.

The purpose of Don's attendance at the academy was twofold: (1) To help him overcome the mental and emotional problems which psychiatric examination had indicated were likely to lead toward serious and chronic maladjustment, and (2) to help him overcome his academic deficiencies so that he could continue his education in a traditional institution of learning. A portion of the expenses incurred

for Don at Oxford Academy was primarily for the prevention or alleviation of a mental defect or illness.

The cost of attending Oxford Academy was a minimum of $875 per month plus additional charges. Fees are billed at a flat rate for all services. The cost of attending general preparatory schools in the New Jersey and New England area as a boarding student in 1962 was approximately $2,800 per school year.

During the taxable years 1961 and 1962, petitioner paid the sum of $1,000 and $10,682.81, respectively, to the Oxford Academy. Petitioners did not claim a deduction as to the $1,000 on their return for 1961, but did so in their petition. In their tax return for 1962, petitioners claimed total medical expenses of $10,961.31. Included in this amount was the $10,682.81 paid to the Oxford Academy.

Respondent in the notice of deficiency disallowed as a medical expense all of the amounts paid the Oxford Academy.

## Ultimate Findings of Fact

(1) During the taxable years 1960–62, inclusive, petitioner was not in the trade or business of chartering aircraft, and the expenses relating to the aircraft were not incurred to maintain or improve skills required in petitioner's business.

(2) A portion of the expenses incurred by petitioner for his son's attendance at Oxford Academy was primarily for the prevention or alleviation of a mental defect or illness.

### OPINION

### Issue 1. Airplane Expenses

Petitioner has had a long and distinguished career in the U.S. Navy, both as an aviator and as a research and development engineer in the field of aviation. In February 1960, with imminent retirement from the Navy facing him, petitioner purchased a small airplane. On his 1960 Federal tax return, petitioner reported income of $225 from a charter fee and expenses of operation, including depreciation of $2,224.15. In his 1961 and 1962 returns petitioner reported no income from operation of the aircraft, but deducted maintenance expenses and depreciation. Respondent has disallowed all these deductions as personal expenses. Petitioner claims he is entitled to the deduction under Code section 162.

Petitioner's argument to support the deduction appears to be based on two separate grounds: (1) That the aircraft expenses were expenses incurred in carrying on his business, and (2) that the aircraft expenses are deductible as education expenses in that the aircraft was used to "maintain or improve" his skills as an aircraft pilot.

It is axiomatic that there can be no deduction under section 162 unless the taxpayer has a trade or business, and the expenditures deducted are related thereto. Whether the taxpayer is carrying on a "trade or business" within the meaning of section 162 depends on the facts in each case. *Higgins* v. *Commissioner*, 312 U.S. 212, 217 (1941). The phrase "trade or business" refers to extensive activity over a period of time for the purpose of producing income. *Kerns Wright*, 31 T.C. 1264 (1959), affirmed per curiam 274 F. 2d 883 (C.A. 6, 1960). While profit and loss are factors to be considered, the fact that an activity is carried on at a loss for a period of time does not itself preclude recognition as a trade or business. *Hirsch* v. *Commissioner*, 315 F. 2d 731 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; *Doggett* v. *Burnet*, 65 F. 2d 191 (C.A.D.C. 1933). Carrying on a trade or business involves "holding one's self out to others as engaged in the selling of goods or services." *Deputy* v. *DuPont*, 308 U.S. 488, 499 (1940) (Frankfurter, *J.*, concurring) ; *White's Will* v. *Commissioner*, 119 F. 2d 619 (C.A. 3, 1940) ; *McDowell* v. *Ribicoff*, 292 F. 2d 174 (C.A. 3), certiorari denied 368 U.S. 919 (1961).

Petitioner was not in the business of chartering his aircraft during the years 1960–62. Petitioner testified that he did not advertise or hold himself out in any manner as being in the business of chartering aircraft; rather, he devoted his time to performing services as an engineering consultant. His only income from chartering was the amount of $225 reported in 1960; profit-seeking activity required by section 162 was simply not proved.

Nor can it be said that the aircraft expenses were proximately related to petitioner's employment as an engineering consultant. Cf. *Kornhauser* v. *United States*, 276 U.S. 145 (1928). Petitioner offered no evidence whatsoever of any flying of his aircraft in conjunction with this business during the years in question. While his skill as an aeronautical *engineer* was important to his work, he did not establish that it was necessary for him to fly his own aircraft to utilize this skill.

Indeed, petitioner's primary argument is not that he needed the aircraft for current business, but rather that it was needed to maintain his skill as a pilot in case he had to rely on this skill at a later date in order to produce income. This, he argues, is sufficient to meet the "educational expense" requirements of the regulations under section 162, as expenses for education which "Maintains or improves skills required by the individual in his * * * trade or business." Sec. 1.162–5(a)(1), Income Tax Regs. In support of this argument petitioner cites *Elliott* v. *United States*, 250 F. Supp. 322 (W.D.N.Y. 1965). In *Elliott*, the taxpayer, formerly a professional harpist, deducted the cost of instruction received from a leading harp instructor preparatory to resuming her career which had been curtailed for a

period of years by her marriage. In 1959 she decided to increase her activity as a professional harpist and took lessons to increase her proficiency. While the grounds for the decision of that case are not entirely clear, it appears that the court allowed her to deduct depreciation on her harp from 1960 on, and held that the harp lessons were deductible.

We think the *Elliott* case is distinguishable. The court in *Elliott* found that the taxpayer was in a trade or business as a professional harpist from 1959 on, and therefore was entitled to deduct the expense of lessons necessary to maintain or improve her skills in that profession. In the case at bar, however, petitioner was not in the business of flying his plane for charter and did not use it in his business as a consultant in the years in issue. If these expenses relate to any trade or business whatsoever they relate to a business petitioner perceived he might have to *resume*, and this Court has held that this is not sufficient to qualify the expenses under section 162. *Henry G. Owen*, 23 T.C. 377 (1954) ; see *Munroe* v. *United States*, an unreported case (S.D.N.Y. 1965, 16 A.F.T.R. 2d 5170, 65-2 U.S.T.C. par. 9495) ; cf. *Canter* v. *United States*, 354 F.2d 352 (Ct. Cl. 1965). Petitioner was concerned with the possibility of making a profit as an aircraft pilot some time in the future, not during the tax years in issue. Cf. *Riddle* v. *United States*, 205 F. Supp. 357 (D. Colo. 1962). It follows that petitioner is not entitled to the claimed deductions.

## Issue 2. Medical Expenses

The law controlling the deductibility of the disputed medical expenses is section 213 (a) and (e) of the Internal Revenue Code of 1954 [2] (prior to amendments effective for taxable years beginning after December 31, 1966), as amplified by section 1.213–1 (e) (1), Income Tax Regs.[3]

---

[2] SEC. 213. MEDICAL, DENTAL, ETC., EXPENSES.

(a) ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction the following amounts of the expenses paid during the taxable year, not compensated for by insurance or otherwise, for medical care of * * * a dependent (as defined in section 152) : * * *

\*         \*         \*         \*         \*         \*         \*

(e) DEFINITIONS.—For purposes of this section—

(1) The term "medical care" means amounts paid—

(A) for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body * * *

[3] (e) *Definitions*—(1) *General*. (i) The term "medical care" includes the diagnosis, cure, mitigation, treatment, or prevention of disease. Expenses paid for "medical care" shall include those paid for the purpose of affecting any structure or function of the body * * *

(ii) Amounts paid for operations or treatments affecting any portion of the body, including obstetrical expenses and expenses of therapy or X-ray treatments, are deemed to be for the purpose of affecting any structure or function of the body and are therefore paid for medical care. Amounts expended for illegal operations or treatments are not deductible. Deductions for expenditures for medical care allowable under section 213 will be

The first question presented is whether petitioner's son, Don, was suffering from a "disease" as that term is used in the statute and the applicable regulation. Giving that term its conventional meaning, we think the evidence clear, believable, and uncontradicted that Don was suffering from a disease[4] when he entered Oxford Academy. As detailed in our findings, the report of the Institute of the Pennsylvania Hospital states that as of that date Don had "not evolved the usual 'defense' or integrating mechanisms necessary for dealing maturely, realistically and in an organized fashion, with the problems of his environment. * * * It is an immature status and its continuance could lead Don towards serious and chronic maladjustment * * *." Nathaniel

confined strictly to expenses incurred primarily for the prevention or alleviation of a physical or mental defect or illness. * * *

*      *      *      *      *      *      *

(v) The cost of in-patient hospital care (including the cost of meals and lodging therein) is an expenditure for medical care. The extent to which expenses for care in an institution other than a hospital shall constitute medical care is primarily a question of fact which depends upon the condition of the individual and the nature of the services he receives (rather than the nature of the institution). A private establishment which is regularly engaged in providing the types of care or services outlined in this subdivision shall be considered an institution for purposes of the rules provided herein. In general, the following rules will be applied:

(a) Where an individual is in an institution because his condition is such that the availability of medical care (as defined in subdivisions (i) and (ii) of this subparagraph) in such institution is a principal reason for his presence there, and meals and lodging are furnished as a necessary incident to such care, the entire cost of medical care and meals and lodging at the institution, which are furnished while the individual requires continual medical care, shall constitute an expense for medical care. For example, medical care includes the entire cost of institutional care for a person who is mentally ill and unsafe when left alone. While ordinary education is not medical care, the cost of medical care includes the cost of attending a special school for a mentally or physically handicapped individual, if his condition is such that the resources of the institution for alleviating such mental or physical handicap are a principal reason for his presence there. In such a case, the cost of attending such a special school will include the cost of meals and lodging, if supplied, and the cost of ordinary education furnished which is incidental to the special services furnished by the school. Thus, the cost of medical care includes the cost of attending a special school designed to compensate for or overcome a physical handicap, in order to qualify the individual for future normal education or for normal living, such as a school for the teaching of braille or lip reading. Similarly, the cost of care and supervision, or of treatment and training, of a mentally retarded or physically handicapped individual at an institution is within the meaning of the term "medical care".

(b) Where an individual is in an institution, and his condition is such that the availability of medical care in such institution is not a principal reason for his presence there, only that part of the cost of care in the institution as is attributable to medical care (as defined in subdivisions (i) and (ii) of this subparagraph) shall be considered as a cost of medical care; meals and lodging at the institution in such a case are not considered a cost of medical care for purposes of this section. For example, an individual is in a home for the aged for personal or family considerations and not because he requires medical or nursing attention. In such case, medical care consists only of that part of the cost for care in the home which is attributable to medical care or nursing attention furnished to him; his meals and lodging at the home are not considered a cost of medical care.

[4] That mental disorders can be "disease" within the meaning of sec. 213(e)(1)(A) is no longer open to question. See *Hobart J. Hendrick,* 35 T.C. 1223 (1961); *Martin J. Lichterman,* 37 T.C. 586 (1961); *David E. Starrett,* 41 T.C. 877 (1964); Rev. Rul. 63–91, 1963–1 C.B. 54. See also Muchin, "Private Schooling for Emotionally Disturbed Children: Is It a Medical Expense?" 44 Taxes 699 (1966). While Congress may have intended to limit the definition of "medical care" in sec. 213(e) as to what would qualify as an expense, see *Commissioner* v. *Bilder,* 369 U.S. 499 (1962), there is no indication that they intended a narrow definition of "disease."

Boonin a psychiatrist who treated Don for almost a year, described him as a child with "significant neurotic blocks against learning." Edward R. Knight, headmaster of Oxford Academy and a State-certified psychologist, described Don's problems as "deep-rooted and severe."

The evidence is also plain, we believe, that the services rendered Don constituted "medical care" as that term is defined in section 213: "The * * * cure, mitigation, treatment or prevention of disease." The cases, the rulings, and the regulations make clear that whether a service for which an expenditure is made constitutes medical care will depend upon its therapeutic nature to the individual, and not upon the title of the person rendering the service,[5] or whether the expense is "medical" to all persons,[6] or the general nature of the institution in which the service is rendered.[7]

Don's program at the academy was not designed merely to correct academic deficiencies, as respondent contends. Respondent relies mainly upon a brochure published by the academy describing the institution as a small, private, highly specialized college-preparatory school for normal boys who have academic deficiencies. But this argument, based as it is on public relations literature, ignores the facts set forth in our findings which were taken from the consistent, undisputed, believable testimony of the witnesses. Knight testified that the term "normal" when used in describing individuals may include persons with a wide range of emotional problems. The term was evidently intended to refer to boys with normal intelligence and capabilities and to exclude persons suffering from psychosis or mental retardation.

Don was enrolled at the academy following a long-term failure of an effort to correct his academic deficiencies at Hun School. During a part of that period, he also received psychotherapy from Nathaniel Boonin. These separate approaches solved neither his academic nor his

---

[5] See Rev. Rul. 63–91, 1963–1 C.B. 54, modifying Rev. Rul. 55–261, 1955–1 C.B. 307; Rev. Rul. 58–339, 1958–2 C.B. 106; Rev. Rul. 64–173, 1964–1 C.B. (Part 1) 121; *Estate of Reuben A. Baer*, T.C. Memo. 1967–34; *Estate of Myrtle P. Dodge*, T.C. Memo. 1961–346; *Estate of Jacob Hentz, Jr.*, a Memorandum Opinion of this Court dated Apr. 6, 1953. Cf. *George B. Wendell*, 12 T.C. 161 (1949).

[6] See Rev. Rul. 62–210, 1962–2 C.B. 89 (clarinet lessons); Rev. Rul. 62–189, 1962–2 C.B. 88 (wig); Rev. Rul. 67–339, 1967–2 C.B. 126 (oral contraceptives).

[7] "The extent to which expenses for care in an institution other than a hospital shall constitute medical care is primarily a question of fact which depends upon the condition of the individual and the nature of the services he receives (rather than the nature of the institution)." Sec. 1.213–1(e)(1)(v), Income Tax Regs. See Rev. Rul. 55–261, 1955–1 C.B. 307, 310:

> 9. *Fees paid to health institutes.*—Ordinarily, fees paid to a health institute where the taxpayer takes exercise, rubdowns, etc., are held to be personal expense, deduction for which is prohibited by section 24(a)(1) of the [1939] Code. However, fees paid to health institutes may be deductible as medical expenses only when such treatments by such institutes are prescribed by a physician and are substantiated by a statement by the physician that the treatments are necessary for the alleviation of a physical or mental defect or illness of the individual receiving the treatments.

See also Rev. Rul. 58–280, 1958–1 C.B. 157.

emotional problems. At the academy an integrated program was developed which took into account the interrelationship between the two problems. Don had daily psychotherapy sessions with Edward R. Knight, a highly trained and certified psychologist. Other members of the staff with extensive training and experience in dealing with similar cases, working under Knight's direction, counseled Don on extra academic matters. His entire instruction schedule was individualized so as to deal with his emotional and psychological problems as well as his academic needs. His instructors, handpicked to implement the program designed for Don, met regularly with Knight to plan each step. Don was assigned to a room next door to one of the masters. These services, in our view, were directed toward the "cure," "mitigation," or "treatment" of Don's "disease" and as such were medical care. Cf. *David E. Starrett*, 41 T.C. 877 (1964). "Certainly, the definition of medical expenses is sufficiently broad to include amounts paid to qualified psychologists and psychiatrists, and respondent has, in fact, so ruled. Rev. Rul. 143, 1953-2 C.B. 129." *Hobart J. Hendrick*, 35 T.C. 1223, 1237 (1961).

To support the denial of any deduction for expenditures for Don's care at Oxford Academy, respondent argues that the "cost of ordinary education" was not incidental to the psychological services furnished by Oxford and that Oxford, therefore, was not a "special school" within the intent of the regulations.

We agree with respondent that Oxford Academy was not a "special school" as that term is used in subparagraph (a) of the regulation quoted in footnote 3. While the language of the regulation is far from clear, subparagraph (a) appears to refer to an institution where education is only "incidental" to medical care; the concrete example refers to "a school for the teaching of braille or lip reading." Oxford Academy is not such an institution. Cf. *H. Grant Atkinson, Jr.*, 44 T.C. 39 (1965).

However, we cannot agree with respondent that the fact that Oxford was not a special school forecloses any deduction. To do so would be to read the "rule" of subparagraph (a) which is to be applied only "In general" to eliminate the broader provisions in paragraph (v) that "The extent to which expenses for care in an institution * * * shall constitute medical care * * * depends upon the condition of the *individual* and the nature of the services *he* receives (*rather than the nature of the institution*) [emphasis added]." See *Hobart J. Hendrick*, *supra* at 1237. Compare Rev. Rul. 55-261, fn. 7, *supra*.

In making an alternative argument that petitioner's expenses for Oxford Academy's services to Don should be allocated between deductible medical expenses and nondeductible educational expenses, respondent concedes that the "facts in issue come very close to being

on all fours" with *Hobart J. Hendrick, supra*, where this Court made such an allocation. We agree, and we conclude that an allocation should be made here. Prior to entering Oxford Academy, Don attended Hun School and contemporaneously received psychiatric service from Nathaniel Boonin; the Hun School expenses were nondeductible personal expenses under Code section 262, whereas the expenditures for Boonin's services were clearly deductible expenses for medical care under section 213. Don then entered Oxford Academy where he received for a single fee both educational and medical services. We do not read the statute or the regulations to require in these circumstances either a denial of any deduction or the allowance of the full amount of the expenses as a deduction. Accordingly, to the extent the fee included the cost of Don's education as distinguished from the cost of treatment for his mental and emotional problems they are not deductible. Cf. *Commissioner* v. *Bilder*, 369 U.S. 499 (1962). To the extent they were incurred for medical care they are deductible.

The record does not show what portion of the Oxford Academy fees were attributable to each of the two services but it discloses that the cost of attendance at other private schools in the New Jersey area during this period was approximately $2,800 per school year. The fees paid by petitioner to Oxford Academy for the services rendered to Don in excess of this sum, we believe, may reasonably be attributed to the psychotherapy and related services provided by Knight and other staff members working under his direction in attempting to cure or mitigate Don's mental and emotional problems. Accordingly, adjusting for the fact that the costs of attendance at other schools are based on an academic rather than a calendar year, we hold that petitioner's expenses for Don at Oxford Academy in excess of $3,500 in 1962 and a similar proportionate part of the $1,000 expended in 1961 are deductible as costs of medical care under section 213.

Respondent fears that a decision for petitioner on this issue will encourage parents to obtain a recommendation from a psychiatrist before sending their child to a private school in order to take advantage of section 213. We think this fear unrealistic. Section 213 speaks in terms of disease; minor disciplinary problems or adolescent upsets would not be sufficient. Courts dealing with the problem would require strong proof in light of *Commissioner* v. *Bilder, supra*—proof of the nature presented to the Court in the present case. In any event, we note that the Commissioner has announced his acquiescence in our *Hendrick* decision (1962–2 C.B. 4), and that he has not withdrawn such acquiescence. We do not regard our opinion here as a significant extension of that decision.

## *Issue 3. Section 6651(a) Penalties*

Respondent has determined delinquency penalties under section 6651(a) for the tax years 1960–62, inclusive. Petitioner has challenged these determinations but has offered no evidence that the returns were timely or that the delinquency was due to reasonable cause. Petitioner had the burden of proof on the issue, *Welch* v. *Helvering*, 290 U.S. 111 (1933), and respondent's determination must be sustained.

Petitioner also challenges the method of computation of the penalty, arguing that it may be applied only to the amount of tax shown due on the return without regard to a later determination of a deficiency. However, the delinquency penalty is imposed on the amount of tax "*required* to be shown on the return," sec. 6651(b) (emphasis added), and this includes tax arising out of a deficiency, since the "required" amount of tax clearly means the correct tax liability. See sec. 301.6651–1(b), Proced. & Admin. Regs. We have considered petitioner's other arguments as to the method of computation and find them similarly unmeritorious. Of course, the computation of the precise amount of the 6651(a) penalty will depend on a computation of tax due in light of our decision on the primary issues.

*Decision will be entered under Rule 50.*