VIRGINIA G. EDGAR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Edgar v. Comm'r
Docket No. 5375-77. United States Tax Court T.C. Memo 1979-524; 1979 Tax Ct. Memo LEXIS 7; 39 T.C.M. (CCH) 816; T.C.M. (RIA) 79524; December 31, 1979, Filed Lewis P. Terrell, for the petitioner. *10 David L. Jordan and Douglas R. Fortney, for the respondent. FEATHERSTON
MEMORANDUM FINDING OF FACT AND OPINION FEATHERSTON, Judge: For the years 1971, 1972, 1973, 1974, and 1975, respondent determined deficiencies in petitioner's Federal income tax in the respective amounts of $49.69, $73.02, $657.82, $1,000.78, and $615.33. Due to concessions by the parties, the issues remaining for decision are: 1. Whether a loan of $20,000 by petitioner to Lake Havasu Estates on March 27, 1972, was wholly worthless in 1973, and if the loan was worthless, whether it constitutes a business or a nonbusiness bad debt. Also, whether expenses of a trip to Arizona and attorneys' fees incurred in connection with the loan qualify as business expenses. 2. Whether $1,800 received in 1973 from the Teacher Retirement System of Texas is includible in gross income. 3. Whether bank service charges of $45.60 and $81.59 and finance charges of $53.50 and $166.55 were deductible as interest in 1974 and 1975, respectively. 4.Whether $160 paid to a dentist was deductible as a medical expense in 1975. 5. Whether the cost of noon meals taken in the school cafeteria with pupils, *11 may be deducted. 6. Whether premiums for trip insurance on a travel trailer used for trips to inspect real property and travel expenses incurred during such trips qualify as business deductions. 7. Whether dues paid to teacher organizations in 1973 and teaching supplies purchased in 1973 and 1975 qualify as business deductions. [1]/ 8. Whether the statute of limitations bars assessment and collection of deficiencies determined for 1971 and 1972 as a result of disallowing the claimed bad debt deduction for 1973. 9. Whether petitioner's motion for summary judgment should be granted on the grounds that her administrative appeal rights were denied. [2]/ *12 FINDINGS OF FACT Petitioner Virginia G. Edgar was a legal resident of Lubbock, Texas, when her petition was filed. She filed her individual Federal income tax returns for 1973, 1974, and 1975 with the Director, Internal Revenue Service Center, Austin, Texas. 1. Lake Havasu Estates Debt
On March 27, 1972, petitioner loaned $20,000 to Lake Havasu Estates, an Arizona corporation, and received a note dated April 5, 1972, in which the debtor promised to pay her 60 monthly installnents of $433.34 on the first day of each month beginning May 1972. She received the payments until about April or May 1973. The note was purportedly secured by a realty mortgage on a described lot in Mohave County, Arizona. In fact, the debt was unsecured. On March 8, 1973, Lake Havasu Estates filed a petition for a Chapter IV bankruptcy proceeding. On April 25, 1973, the proceeding was converted to a Chapter X corporate re-organization in Phoenix. When in April or May 1973, she was informed by letter that Lake Havasu Estates was in receivership and failed to receive interest payments on the loan, petitioner attempted without success to obtain further information about the condition of the *13 company, retained attorneys to represent her in the matter, and traveled to Arizona. Petitioner paid Jack Law and Jan Fouts $400 and $5, respectively, for legal services. She had a receipt for $30 of the payment to the former. Petitioner filed a proof of claim dated May 7, 1975, for the $20,000 loan. The trustee of the Estate of Lake Havasu Estates has recommended that petitioner's claim be allowed as an unsecured claim. In a status report dated March 31, 1978, the trustee listed 7,443 lots in Arizona and Colorado and 5,557.1 acres of raw acreage in Arizona available for sale or for satisfying claims of creditors. He proposed as alternative plans either a retail sales program, the proceeds of which would be used to pay dividends to creditors, or a "lot deed out" program in which creditors would be offered a random selection of lots. In the opinion of the trustee, the former plan was not financially feasible at the time of the status report. The status report assigned no values to the Arizona and Colorado real estate. 2. Retirement System Payments
Petitioner's husband, a professor at Texas Tech University in Lubbock, Texas, died on August 11, 1969. While employed *14 by Texas Tech University, petitioner's husband contributed a total of $1,525 to the Teacher Retirement System of Texas (Retirement System). Petitioner, age 39 at her husband's death, elected a settlement plan which provided for survivor benefits payable to a widow with one or more children under 18. If petitioner did not remarry, these benefits would consist of a $500 lump sum payment plus $150 per month, the monthly payments continuing until the youngest child reached age 18. In addition, petitioner was to receive for life monthly payments of $75 when she reached age 65. At the effective date of the plan, petitioner's youngest child, Stan, was age 10. The Retirement System furnished petitioner with a document entitled "Income Tax Information" which stated in part: Under the present Federal income tax laws, you are required to pay income tax on a percentage of this annuity since it will take more than three years to recover the "investment in contract." Haroad S. Edgar's contributions were $1,525.00. In addition you are entitled to a $5,000 allowance as "investment in contract" under Section 1.72-8(b) of the Internal Revenue Regulation. After deducting the $500 lump sum *15 payment you received, your "investment in contract" is $6,025.00. The "expected return" from this annuity is $27,630.00. The "investment in contract" is 21.81% of this total value; therefore 21.81% of each warrant, or $32.72 will be considered as return of investment and 78.19% or $117.28 will be taxable as retirement income. It is your responsibility to report these payments on Schedule B. (Part A) of Internal Revenue Form 1040. Petitioner did not remarry during the years at issue. In 1973, petitioner received $1,800 under the settlement plan. 3. Interest
During 1974 and 1975, petitioner paid bank service charges on her checking account in the respective amounts of $45.60 and $81.59. Petitioner paid both personal and business expenses from this one checking account. Petitioner bought a 1976 Mercedes Benz under a retail installment contract dated December 9, 1975. The contract provided for a first monthly payment to General Motors Accpetance Corporation (GMAC) on January 24, 1976. The total finance charge on the purchase was $2,295.35: $1,113.24 for 1976, $747.36 for 1977, $381.25 for 1978, and $53.50 for 1979. On December 8, 1975, petitioner borrowed $2,000 *16 from the Texas Bank. She signed a note for $2,185.56 payable in 18 consecutive monthly installments of $121.42, with the first payment due on January 5, 1976. The amount of the note included the finance charge of $166.55. 4. Dental Expense
Petitioner and Stan had dental appointments with Dr. Gregory in November or December 1975, and December 1975, respectively. Prior to July 1976, petitioner paid Dr. Gregory $160 for these visits. 5. Meals Expense
In 1973 and 1974, petitioner was an elementary school teacher in the Lubbock Public City Schools. At her school, students were given a 20-minute lunch break. Like other teachers, petitioner was required to take her pupils to the school cafeteria and remain with them during the lunch period. Petitioner bought her lunches in the cafeteria at the regular price. During 1973, she spent 45 cents per day for lunch for 180 days, or $81, and during 1974, 55 cents per day for 170 days, or $93.50. 6.Insurance Premiums and Travel Expenses
In 1973, petitioner took trips during vacations to inspect real property which she owned in Ocean Springs, Mississippi, and Gruis Ferry Lake, Arkansas. Along with her two children, *17 petitioner traveled in an Air-Stream trailer which she used solely for trips to inspect these real estate holdings. She recorded in a daily log the meal, hook-up, and transportation expenses incurred during these trips. In 1975, petitioner paid $179 as premiums for insurance on the trailer. Later, she was notified that the insurance company was in bankruptcy and that a new insurance policy was required on or before October 3, 1975. 7. Professional Expenses
In 1973, petitioner paid professional dues to various organizations and purchased teaching supplies and materials. In 1975, petitioner purchased supplies, such as paper, magazines, books, and records, to be used in connection with her teaching. These supplies cost a total of $183.67. 8. Petitioner's Tax Treatment of Disputed Items
On her 1973 Federal income tax returns, petitioner excluded from gross income $1,800 received from the Retirement System. She deducted $9,700 attributable to the Lake Havasu Estates loan as a capital loss, $450 for "Trip on Property" and $600 for "Legal Fees for Property" as well as $108 for meals at school and $622.82 as "Mics [sic] Expense. Petitioner filed a Form 1045 for *18 a tentative carryback adjustment to be applied to the years 1970, 1971, and 1972 due to a net operating loss carryback in the amount of $10,438.19 attributable to the Lake Havasu Estates bad debt deduction. Respondent allowed a resultant overpayment of income taxes for the years 1971 and 1972 in the respective amounts of $49.69 and $73.02. On her 1974 return, petitioner claimed a net operating loss carryover deduction in the amount of $5,958.63 which was attributable to the claimed Lake Havasu Estates bad debt. She deducted as interest $1,706.15 and as lunches, $93.50. On her 1975 return, petitioner deducted as interest bank service charges of $81.59 and finance charges of $53.50 and $166.55 and as medical and dental expenses $1,418.50. She also deducted $181.15 for teaching supplies and $179 for "Ins. Co. going broke." The Commissioner issued a notice of deficiency dated March 4, 1977, for the years 1971, 1972, 1973, 1974, and 1975. The notice included in income for 1973 the $1,800 received from the Retirement System and disallowed the bad debt and meals deduction in full as well as $144.44 of the $450 travel expense deduction, $500 of the attorneys' fee deduction, and *19 $448.35 of the miscellaneous expense deduction. For 1974, he disallowed in full the net operating loss and meals deduction and $45.60 of the interest deduction. For 1975, the Commissioner disallowed in full all of the above-mentioned deductions except those for medical and dental expenses, of which he disallowed $363.67, and for teaching supplies, of which he disallowed $13.57. [3]/ OPINION 1. Lake Havasu Estates Debt
Because the debtor went into bankruptcy in 1973, petitioner argues that she is entitled to deduct in that year both the amount of a $20,000 loan as a bad debt and related travel and legal fees as business expenses. Respondent, on the other hand, maintains that petitioner has not established the worthlessness of the debt in 1973 and that she has not substantiated the amounts of the business expense deductions. [4]/ *20 In general, bankruptcy indicates that at least part of an unsecured debt is worthless. Sec. 1.166-2(c), Income Tax Regs. However, the mere fact that the debtor went into bankruptcy during the year does not satisfy petitioner's burden of proving entitlement to a bad debt loss in that year. P. H. Gill & Sons Forge & Machine Works v. Commissioner,7 B.T.A. 1146, 1147 (1927); accord Dallmeyer v. Commissioner,14 T.C. 1282, 1291-1294 (1950). In our view, petitioner has not carried her burden of showing that the Lake Havasu debt became worthless in 1973. Indeed, evidence with respect to later years is inconsistent with a view that the debt was wholly worthless in 1973. In 1975, petitioner filed a proof of claim. A status report filed by the trustee in 1978 indicates that, at that time, the debtor held substantial amounts of real estate with an unspecified value. As of the time of the report, bankruptcy proceedings were still pending with a view toward satisfying insofar as possible the claims of creditors. Under these circumstances, petitioner has not proven that the debt was worthless in 1973. Nor can the related travel *21 and legal expenses be allowed under section 162(a) n[5]/ relating to ordinary and necessary business deductions. An item is deductible as a business expense under section 162(a) only if it is related to a trade or business of the taxpayer. "Trade or business" has been defined to mean extensive activity carried out over a period of time in order to produce income. Fischer v. Commissioner,50 T.C. 164, 171 (1968). Mere investment activity does not constitute a trade or business. Higgins v. United States,312 U.S. 212 (1941). Here the debt was made as an investment, with no indication that it was related to a trade or business of the taxpayer. We note that petitioner is also not entitled to a deduction under section 212 for the travel expenses and legal fees. She introduced no testimony or documentary evidence to substantiate the travel expense deduction. Several court decisions have held that legal fees incurred in order to recover interest are deductible under section 212 but that those paid *22 to recover loan principal are not. See, e.g., Kurkjian v. Commissioner,65 T.C. 862, 871 (1976); Kelly v. Commissioner, 23 T.C. 682 (1955), affd. 228 F.2d 512, 515-516 (7th Cir. 1956). The evidence presented on this issue does not permit the allowance of any portion of the expenses as a deduction. [6]/ In other words, we are unable to allocate any portion of the legal expenses to an attempt to collect interest. Petitioner maintains that the likelihood of recovery is small, particularly because no distribution has been made since the company filed for bankruptcy in 1973. Relying on Montgomery v. United States,23 F.Supp. 130, 87 Ct. Cl. 218 (1938), she argues that deduction is proper at a time when the possibility of recovery is minimal.In Montgomery, the taxpayer deducted as a worthless debt the cost of bonds of a club which, to his personal knowledge, had defaulted in the payment of interest on the bonds, had defaulted on *23 a mortgage which had priority over the bonds, and had failed to pay real property taxes. Under these circumstances, the court upheld the taxpayer's determination that the bonds were worthless in the year of deduction. In contrast, petitioner relies solely on the fact that Lake Havasu Estates is in bankruptcy. 2. Retirement System Payments
Petitioner claims that annual payments in the amount of $1,800 received from the Retirement System are excludible from income as insurance. [7] Respondent disputes qualification under section 101(a). He now concedes, however, that the payments are subject to the limited exclusion provided by sections 101(b) and 72 for employee death benefits and amounts received as an annuity. [8] In our view, the payments are not insurance under section 101(a) but are employee benefits of the type described in section 101(b). *24 Section 101(a)[9]/ generally excludes from income amounts which are received under a life insurance contract and which are paid by reason of the death of the insured. Although the definition of a life insurance contract encompasses agreements other than those in the form of a standard life insurance contract, an agreement described in section 101(a) must possess the basis characteristics of insurance. Tighe v. Commissioner,33 T.C. 557, 564 (1959). *25 An essential characteristic of life insurance is the element of risk shifting and risk distribution, in other words, shifting the risk of premature death of the insured from himself or his beneficiaries to a group among which that risk is distributed. Helvering v. Le Gierse,312 U.S. 531, 540 (1941). Thus, a life insurance contract provides that "the payor's estate or beneficiaries will be paid a certain amount upon his death regardless of whether the amount is more or less than decedent has paid into the fund." Tighe v. Commissioner,supra at 564. Under the Retirement System, an individual whose membership terminates is entitled to a refund of his contributions plus accrued interest. For each individual who is a member at death, benefits are payable to the estate or to one or more beneficiaries. Although the beneficiaries of each decedent do not enjoy the same variety of settlement options, in no case are beneficiaries of each member entitled to less than the amount of the decedent's contributions plus accrued interest. Therefore, the Retirement System benefits do not fit the definition set forth in Tighe , since a member, either directly *26 or indirectly through his beneficiaries, will receive a sum no less than that which he has paid into the fund. Tex. Educ. Code art. 2922-1, secs. 7, 8 (Vernon 1965). In reaching our decision, we are not unmindful of the holding of the Fifth Circuit, to which this case is appealable, in Ross v. Odom,401 F.2d 464 (5th Cir. 1968). In that case, the Fifteh Circuit held that payments received under the Georgia Survivors' Benefit Program constitute life insurance within the meaning of section 101(a) even though such payments may also be described in section 101(b). In our view, that case is distinguishable. As the court explicitly noted, the taxpayer in Ross v. Odom,supra, received payments from a retirement system program as well as from the survivor benefit program.Since she did not dispute treatment of the former type of payments as section 101(b) employee death benefits, the Fifth Circuit holding covered only the survivor benefit payments. Moreover, the court relied in part on expert testimony that the survivor benefit fund was actuarially sound. In contrast, the payments at issue here were received from a retirement system which funded *27 payments to retired members as well as to the beneficiaries or estates of either such members or of members who died before retirement. Moreover, there is before us no evidence as to whether the system was in fact actuarially sound. See Davis v. United States,323 F.Supp. 858, 861-862 (S.D. W.V.a. 1971). 3. Interest
Petitioner deducted as interest bank service charges of $45.60 in 1974 and $81.59 in 1975 as well as finance charges of $53.50 and $166.55 in 1975. Respondent contends that the bank service charges in both years constitute neither interest nor business expenses and are thus not deductible. He challenges the finance charges on the grounds that petitioner has not proven that they were paid in 1975. We agree with respondent as to all these items.
Interest is "compensation for the use or forbearance of money." Deputy v. Dupont,308 U.S. 488, 498 (1940). A bank service charge on a checking account is not covered by this definition. Although petitioner testified that she wrote checks for both business and personal expenses on the same account, she has provided us with no basis upon which we can allocate any portion of the service *28 charge to business use. Accordingly, the bank service charges are not deductible as business expenses. Respondent maintains that the $53.50 finance charge item represents the 1979 portion of the finance charge on the GMAC contract and that petitioner deducted this amount twice, once as part of the total finance charge of $2,295.35 [10]/ and once separately. At trial petitioner disputed this explanation. She has, however, failed to provide us with any explanation of the item either at trial or on brief. The $53.50 item is thus disallowed. As for the $166.55 finance charge, the contract under which it was paid sets the first payment date as January 5, 1976. Since no payments were made during 1975, this item is also not deductible. 4. Dental Expense
Petitioner deducted $160 in 1975 as the cost of dental appointments for herself and her son, Stan. Respondent denied the deduction because petitioner failed to prove that the deducted amount was paid in 1975. We uphold respondent on this issue. Petitioner and her son testified that they each had dental appointments with Dr. Gregory *29 in 1975. Yet neither was certain whether bills for the appointments were paid in that year. Petitioner's testimony established only that bills for the appointments were paid by July 1976, the date of later appointments with Dr. Gregory. Stan stated that he paid the bill for his visits at his third appointment; he could not, however, recall if the third appointment took place in December 1975, or January 1976. Accordingly, we hold that petitioner has failed to prove that the $160 deducted as medical and dental expenses was paid in 1975. 5. Meals Expense
In 1973 and 1974, petitioner deducted the cost of noon meals she purchased at work while supervising her students. Respondent maintains that she has not met the requirements of section 119, which excludes from gross income the value of certain meals furnished an employee. We agree with respondent.
Under section 119, the value of meals furnished to an employee by his employer is excluded from income if the meals are furnished on the business premises of the employer and for the convenience of the employer. Sec. 1.119-1(a)(1), Income Tax Regs. As the wording of the statute reveals, section 119 *30 authorizes an exclusion from income, not the deduction which petitioner claims. Hence, on the face of it, petitioner cannot satisfy the terms of the statute. See Tougher v. Commissioner,51 T.C. 737, 743-744 (1969), affd. per curiam 441 F.2d 1148 (9th Cir. 1971), cert. denied 404 U.S. 856 (1971). Nor would petitioner prevail if we viewed the amounts at issue as representing, in substance, a cash allowance provided by the employer for meals because section 119 does not apply to cash allowances. Commissioner v. Kowalski,434 U.S. 77 (1977). If a fixed amount is charged whether or not an employee accepts meals, the value of meals furnished at a charge may be excludible under section 119. The exclusion is not, however, available if the employee has a choice of payinf for the meals or providing for meals in another manner. Secs. 1.119-1(a)(3) and 1.119-1(d), Exs. (4) and (8), Income Tax Regs.; Weinberg v. Commissioner,64 T.C. 771, 779 (1975). Here petitioner paid for the meals she ate in the school cafeteria. Petitioner has introduced no evidence to show that she was required to purchase her meals in the *31 cafeteria rather than allowed to bring them with her. Accordingly, we cannot conclude that the value of her meals is excludible. According the petitioner, she is entitled to deduct the cost of lunches eaten at school because her presence during the lunch period was required by her employer. In one case cited by petitioner, Boykin v. Commissioner,260 F.2d 249 (8th Cir. 1958), a physician was required to pay a fixed rental for quarters at his employer's hospital and the amount of the rent was deducted from his salary. The Eighth Circuit held that the rental payment qualified for exclusion under section 119. Stating that section 119 does not authorize a taxpayer to deduct from gross income amounts incurred for meals and lodging, this Court has advanced the following interpretation of Boykin ( Tougher v. Commissioner, supra at 744, fn. 6): In Boykin the mandatory withholding of a fixed amount for rent from the employee's formally designated salary could be regarded in substance as restating his true salary to be the disminished amount thereof, and the employer could be regarded as furnishing the employee the loding in kind. See Boykin v. Commissioner,supra at 254. *32 [11]/ In the instant case, however, no amounts were withheld from petitioner's salary to pay for noon meals. Another case on which she relies, United States v. Barrett,321 F.2d 911 (5th Cir. 1963), has been overruled. Commissioner v. Kowalski,supra at 82, fn. 11. Roth Office Equipment Co v. Gallagher,172 F.2d 452 (6th Cir. 1949), deals with deductibility not of meals by an individual but of officers' salaries by a corporation. Rev. Rul. 75-432, 1975-2 C.B. 60, cited by petitioner, discusses deductibility under section 162(a)(2) of employee meals in the context of travel away from home. Although petitioner has not otherwise relied on section 162(a)(2), we note that it authorizes deductions for meals purchased "away from home" on a trip which requires sleep or rest. United States v. Correll,389 U.S. 299 (1967). Since both petitioner's principal place of employment and her *33 personal residence are in Lubbock, the meals at issue were not purchased away from her tax home. Accord Daly v. Commissioner,72 T.C. 190, 195 (1979); Kroll v. Commissioner,49 T.C. 557, 561-562 (1968). Petitioner's lunch expenses thus fall within the category of "personal, living, or family expenses" for which section 262 explcitly disallows a deduction. United States v. Correll,supra at 302, fn. 7; Drill v. Commissioner,8 T.C. 902, 903 (1947). 6. Insurance Premiums and Travel Expenses
Petitioner deducted $179 for insurance premiums on a trailer used exclusively on trips to inspect land which she owned in Mississippi and Arkansas. Apparently, she bases her claim on the alternative grounds that the trailer was a business asset or that the need to replace a policy issued by a bankrupy insurer resulted in a bad debt loss. Respondent maintains that, petitioner having failed to establish that the trailer was a business asset, the premiums are nondeductible. We agree with respondent.
An item is deductible as a business expense under section 162 only if it is related to a trade or business of the taxpayer. *34 "Trade or business" has been defined to mean extensive activity carried out over a period of time in order to produce income. Fischer v. Commissioner, 50 T.C. 164, 171 (1968). Although renting even a single property has been held to constitute a trade or business, Hazard v. Commissioner,7 T.C. 372 (1946), a taxpayer must establish a profit-seeking motive to qualify for a deduction under section 162 or section 212. Johnson v. Commissioner,59 T.C. 791, 814 (1973), affd. on another ground 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974). Petitioner introduced no evidence to support a finding that she owned the land in coneection with a trade or business. There was, for example, no indication that either piece of property is the source of rental income. Moreover, the lack of rentals also eliminates one ground for a deduction under section 212(1) and (2) for expenses incurred "for the production or collection of income" or "for the management, conservation, or maintenance of property held for the production of income." Property held solely for sale may qualify as property "held for the *35 production of income," within the meaning of section 212(2). Newcombe v. Commissioner,54 T.C. 1298, 1301-1302 (1970). However, the record contains no facts which would enable us to find that the property was held for sale. Hence the insurance premiums are not deductible under section 212. Neither does the bankruptcy of the initial insurer and the consequent need to reinsure the trailer entitle petitioner to a bad debt loss. An insurance policy does not constitute the undonditional obligation to pay which is prerequisite to a bad debt loss. Loewi & Co. v. Commissioner, 23 T.c./ 486, 491 (1954), affd. 232 F.2d 621 (7th Cir. 1956). Inasmuch as the Mississippi and Arkansas real property constitutes neither a trade or business nor incomeproducing property, expenses incurred in trips to inspect the holding are not deductible under section 162 or section 212. To bolster her claim to deduct expenses incurred during trips to inspect real estate, petitioner asserts that: A person has the right to check their [sic] property, and be sure that it is not being destroyed * * *. Yet taxpayers have the right to engage in numerous activities the costs *36 of which are not deductible. E.g., section 262. The only deductions to which a taxpayer is entitled are those explicitly authorized by Congress, New Colonial Co. v. Helvering,292 U.S. 435 (1934); petitioner has not shown that these expenses fall under any Code section which authorizes deductions. 7. Professional Expenses
Respondent disallowed for lack of substantiation $448.35 of the $622.82 amount petitioner deducted as "miscellaneous" expenses in 1973. According to petitioner, the disallowed expenses represent teacher organization dues and class supplies. Respondent further disallowed $13.57 of the $181.15 deducted for supplies in 1975. Petitioner has not shown that she is entitled to deduct as miscellaneous expenses an amount greater than that allowed. For 1975, however, she has established that she incurred $16.09 of supply expenses in addition to the amounts allowed by respondent. Petitioner testified that she $33paid by check to the National Educator's Association and, pursuant to a supplemental stipulation documented $12 in payroll deductions for professional dues and $12 paid by check for expenses related to a teachers' sorority. Because *37 the $57 total expenses established by the record is less than the amount allowed by respondent, we hold that the 1973 miscellaneous deduction was properly disallowed. Petitioner cites Feinstein v. Commissioner,T.C. Memo. 1970-288, in support of her claim to deduct teaching materials and dues to teacher organizations. Although this Court stated in Feinstein that school materials furnished by an elementary school teacher might qualify as trade or business expenses, we allowed only $50 out of about $300 due to lack of substantiation and unsatisfactory oral testimony.In this case, respondent does not deny that expenditures of the type petitioner has claimed qualify as trade or business expenses. He merely disallows some of those claimed due to failure to substantiate. Petitioner testified in detail as to amounts totaling $183.67 spent on supplies in 1975. We hold that she is entitled to deduct an additional $16.09, which represents the excess of $183.67 over the amount allowed by respondent. 8. Deficiencies for 1971 and 1972
According to petitioner, the statute of limitations bars assessment and collection of deficiencies for 1971 and 1972. Because *38 the deficiencies in those years are attributable to a net operating loss carryback, respondent contends that the applicable statute of limitations is that for 1973, the year of the loss. We agree with respondent.
Section 6501(h) provides: In the case of a deficiency attributable to the application to the taxpayer of a net operating loss carryback * * * such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the net operating loss * * * may be assessed. Petitioner filed an Appelication for Tentative Refund, Form 1045, and was allowed a refund of the tax on her 1971 and 1972 returns due to the carryback of her 1973 claimed loss. In the notice of deficiency dated March 4, 1977, respondent disallowed the claimed net operating loss and determined deficiencies in the amounts of the 1971 and 1972 refunds. Because the 1971 and 1972 deficiencies are "attributable to the application to the taxpayer of a net operating loss carryback," the limitations period under section 6501(h) is that "for the taxable year of the net operating loss." Hence the deficiency determinations for 1971 and 1972 are timely since the *39 notice of deficiency was issued within the limitations period for 1973. Secs. 6072(a), 6501(a) and (b). 9. Motion for Summary Judgment
Petitioner has moved for summary judgment on the grounds that her administrative appeal rights were denied. According to respondent, petitioner refused to execute a consent to extend the statute of limitations; under those circumstances, he argues, section 601.105(f), Statement of Procedural Rules, [12] authorizes the Commissioner to issue a notice of deficiency and thus preclude appellate division review. [13]
*40 As petitioner observes, a taxpayer is generally issued a notice of deficiency only after having been informed of administrative appeal rights by the so-called "30-day letter." Sec. 601.105(d)(1), Statement of Procedural Rules. Nonetheless, it is well settled that rules providing for procedures such as the 30-day letter and appellate division review are directory rather than mandatory. Hence the Commissioner's failure to follow these rules does not invalidate the deficiency notice. Montgomery v. Commissioner,65 T.C. 511, 522 (1975); accord Rosenberg v. Commissioner,450 F.2d 529 (10th Cir. 1971), affg. a Memorandum Opinion of this Court. Therefore, petitioner's motion is denied. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ Petitioner has submitted evidence which apparently relates to other deductions of professional expenses claimed in 1974 and 1975. These other deductions for dues, books, and supplies in 1974 and 1975 have, however, been either conceded or allowed in excess of the amount claimed.
2. /↩ In his opening statement, petitioner's counsel stated that he would present evidence to support a 1971 investment credit. Since petitioner neither introduced such evidence at trial nor presented related arguments on brief, we assume that she has conceded this issue.
3. /↩ Due to concessions by respondent, only $470 of the 1973 attorneys' fee deduction and $160 of the 1975 medical and dental expense deduction are now at issue. The $30 attorneys' fee conceded by respondent represents the amount paid to Jack Law for which petitioner retained a receipt.
4. /↩ Due to our disposition of the issue, we do not reach the issue whether the debt constitutes a business bad debt.
5. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
6. /↩ We express no views as to whether the disputed legal expenses may be capitalized and added to the capital loss if the Lake Havasu debt ultimately proves to be worthless.
7. Petitioner's theory is not entirely clear. She states that $8,400 is "the amount of insurance." The plan under which petitioner received the payments makes no mention of an $8,400 sum. We assume that petitioner mentions that amount because an alternate settlement plan which she originally selected provided for a lump sum payment of $8,400. The provisions of that plan are not, however, relevant to the payments at issue. ↩
8. To determine the amount included in income under secs. 72 and 61(a)(9), respondent has used the computations of the Retirement System. According to this computation, the "investment in the contract," within the meaning of sec. 72(c)(1), is $6,025. This amount equals the sum of net contributions, which is total contributions of $1,525 less return of premiums of $500 received on or before the annuity starting date plus the sec. 101(b) $5,000 employees' death benefit exclusion. Secs. 1.72-6(a)(1), 1.72-8(b)(1), 1.101-2(a), Income Tax Regs. The "expected return," within the meaning of sec. 72(c)(3), is $27,630, an amount apparently computed under sec. 1.72-5(a)(3) and (4), Income Tax Regs., using Tables I and IV set forth in sec. 1.72-9, Income Tax Regs. The computation, according to an "Income Tax Work Sheet" furnished by the Retirement System, is as follows: Life expectancy (SB) Child -
to age 18 (Table IV)
8.0
Widow - same column
(Table IV)
7.9
Widow
(Table I) 39.1
Widow (Table
IV) to age
65 24.3
14.8
Total (multiply
by $900 -
Teacher, $600 -
Aux.)
30.7
Monthly Payment $150 Annual Payment $900
Total Value (Annual payment X Life expectancy)
$27,630
The "exclusion ratio," within the meaning of sec. 72(b), is 21.81 percent, the percentage determined by dividing the investment in the contract by the expected return. Sec. 1.72-4(a)(1)(i), Income Tax Regs.Thus, respondent now seeks to include in income $1,407.42, the amount by which total payments of $1,800 exceed the portion excluded, which is 21.81 percent or $392.58. In connection with the Rule 155 computation, the correctness of the Retirement System calculations with respect to the expected return and the exclusion ratio should be verified, taking into account the fact that the contract provides for two components, a temporary life annuity dependant on two lives, specifically one which will be received by petitioner as long as both she and her child are alive up to the time the youngest child is age 18, and an annuity payable for life which commences when petitioner is age 65.↩
9. /SEC. 101. CERTAIN DEATH BENEFITS. (a) Proceeds of Life Insurance Contracts Payable by Reason of Death.-- (1) General rule.--Except as otherwise provided in paragraph (2) and in subsection (d), gross income does not include amounts received (whether in a single sum or otherwise) under a life insurance contract, if such amounts are paid by reason of the death of the insured. (2) Transfer for valuable consideration.-- In the case of a transfer for a valuable consideration by assignment or otherwise, of a life insurance contract or any interest therein, the amount excluded from gross income by paragraph (1) shall not exceed an amount equal to the sum of the actual value of such consideration and the premiums and other amounts subsequently paid by the transferee. The preceding sentence shall not apply in the case of such a transfer-- (A) if such contract or interest therein has a basis for determining gain or loss in the hands of a transferee determined in whole or in part by reference to such basis of such contract or interest therein in the hands of the transferor, or (B) if such transfer is to the insured, to a partner of the insured, to a partnership in which the insured is a partner, or to a corporation in which the insured is a shareholder or officer.↩
10. /↩ Petitioner has conceded that the $2,295.35 item was properly disallowed.
11. / Moreover, Boykin v. Commissioner,260 F.2d 249 (8th Cir. 1958), was decided before Commissioner v. Kowalski,434 U.S. 77 (1977), which restricted the scope of sec. 119↩.
12. Sec. 601.105(f), Statement of Procedural Rules, Provides in part: The process of field examinations and the course of the administrative procedure described in this section * * * may be interrupted in some cases by the imminent expiration of the statutory period of limitations for assessment of the tax. To protect the Government's interests in such a case, the district director of Internal Revenue or other designated officer may be required to dispatch a statutory notice of deficiency (if the case is within jurisdiction of the United States Tax Court), or take other appropriate action to assess the tax, even though the case may be in examination status.In order to avoid interruption of the established procedure (except in estate tax cases), it is suggested to the taxpayer that he execute an agreement on Form 872 (3r such other form as may be prescribed for this purpose). To be effective this agreement must be entered into by the taxpayer and the district director or other appropriate officer concerned prior to the expiration of the time otherwise provided for assessment. * * * ↩
13. Because the theory advanced by respondent depends on facts which have not been introduced in evidence, we do not base our decision on that theory.↩