HARRY J. SMITH, JR. AND NORMA D. SMITH, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Smith v. Commissioner
Docket Nos. 30325-81, 11569-82, 11570-82, 11571-82, 12795-82, 11763-83.
United States Tax Court
T.C. Memo 1985-567; 1985 Tax Ct. Memo LEXIS 65; 50 T.C.M. (CCH) 1444; T.C.M. (RIA) 85567; November 19, 1985. *65 In 1973, Georgetown University purchased an apartment building known as Alban Towers to alleviate a critical shortage of on-campus dormitory housing for its students. From the time Georgetown University acquired Alban Towers, the property operated at a loss. In 1975, Georgetown University purportedly transferred Alban Towers to a partnership in which Georgetown University was the sole general partner. Petitiners were limited partners in the partnership and they each took their respective distributive shares of the losses generated from Alban Tower's operation. Held, respondent properly disallowed petitioners' claimed deductions because Georgetown University, and not the partnership, was the owner of Alban Towers. The benefits and burdens of ownership of Alban Towers were not transferred to the partnership. Held further, respondent properly determined that petitioners James and Florence Meers are liable for the addition to tax pursuant to sec. 6651(a)(1), I.R.C. 1954. John J. Yurow,John Harllee, Jr. and Richard N. Gale, for the petitioners. Lawrence D. Garr, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: This consolidated case includes *66 16 different petitioners. Appendix A sets forth petitioners by name and docket number, the tax years involved, the deficiencies for each year, where the respective returns were filed, and the places of residence for each petitioner when each petition was filed. Each petition involves the tax consequences of petitionrs-limited partners' investment in a District of Columbia limited partnership known as Alban Towers. After concessions, the issues for our determination are: (1) whether the Alban Towers Limited Partnership should be treated as the owner and operator of the Alban Towers Apartments for Federal income tax purposes; and (2) whether petitioners James and Florence Meers had reasonable cause for failing to file their 1978 joint Federal income tax return within the time prescribed by law. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. In 1973, Georgetown University (hereinafter Georgetown) purchased an apartment building known as Alban Towers in order to alleviate a critical shortage of on-campus dormitory housing for its students. The *67 property (hereinafter Alban Towers) consists of two adjacent parcels located at the southwest corner of Massachusetts and Wisconsin Avenues in Washington, D.C. One parcel contains approximately 72,893 sauare feet of land, which is improved by a six-story apartment building, paved parking spaces and a service driveway. The other parcel contains approximately 52,180 square feet of land, which is improved by a parking lot and a detached dwelling. Georgetown intended to utilize Alban Towers for student housing on a temporary basis until such time as additional housing could be constructed or otherwise made available closer to campus. [2]
The purchase price for Alban Towers was $5,865,000, and Georgetown financed the acquisition entirely with funds borrowed from Chase Manhattan Bank, N.A. The financing was not secured by the property, but rather was secured by marketable securities owned by Georgetown. Alban Towers, unfortunately, was in run-down physical condition and required extensive repairs to the plumbing system and other portions of the structure. As a result, Georgetown incurred substantial renovation *68 costs between the time it acquired the property and September of 1975. The cost of the improvements, however, was not passed on to the students because Georgetown desired to maintain somewhat of a parity with respect to the rent charged to students for on-campus housing. From the time Georgetown acquired Alban Towers, the property operated at a loss. Alban Towers lost $253,033 for its fiscal year ended June 30, 1974 and $435,110 for its 1975 fiscal year. These losses did not include allowances for depreciation. Georgetown was concerned that the losses from the operation of Alban Towers would have an adverse effect on its ability to obtain contributions. Georgetown believed that some potential contributors would not want to donate money to the University if they thought it would go towards subsidizing these losses rather than towards an endowment for education. Thus, Georgetown believed that these losses has a negative impact on its financial position and operating position. During 1975 and the other taxable years in issue, George Houston was, and continues to be, Vice President for Financial Affairs and Treasurer of Georgetown. Petitioner Mr. Smith was treasurer of Georgetown's *69 Alumni Association in 1975 and had been an active alumnus for many years. He had been president of the Alumni Association, a member of the University's Board of Visitors of the School of Armed Services, a member of its Board of Regents, and an adjunct economics professor. He also has contributed $944,669.25 to Georgetown, of which $860,600 was given in 1983. In 1975, and for many years prior thereto, Charles A. Gambrill was a Washington real estate developer and operator. He specialized in acquiring, developing or renovating, and operating rental properties. Mr. Houston, Mr. Smith and Mr. Gambrill have all known each other since approximately 1960. In October of 1974, Mr. Houston and Mr. Smith were both present at a Georgetown Alumni function in St. Louis, Missouri. At that time, Mr. Houston, who believed that Mr. Smith was in need of a tax shelter, discussed with him the possibility of placing Alban Towers in a joint venture. Mr. Houston's purpose for proposing the joint venture arrangement was to eliminate the perceived negative impact of Alban Towers' losses on Georgetown's financial statements and operating position by bringing in partners who would share the accounting *70 losses and by creating debts payable to Georgetown that would generate on paper sufficient interest income to offset Georgetown's share of such losses. In early 1975, Mr. Gambrill and Mr. Smith commenced negotiations with Georgetown for the formation of a limited partnership with respect to Alban Towers, whereby Georgetown would be the sole general partner. It was proposed that the partnership own, operate and eventually redevelop the property. Although the property was unencumbered, the parties were aware of the fact that Georgetown planned to mortgage Alban Towers for $4 million. While Georgetown knew that the depreciation expense on Alban Towers would be valuable to the limited partners, it did not use that positive factor in its negotiations with respect to the allocation of partnership interests among the parties. The possibility of overallocating tax losses to the limited partners, however, was discussed by the parties. Two events occurred in December of 1975. On December 31, 1975, Georgetown refinanced $4 million of its Chase Manhattan Bank loan that had been incurred in Georgetown's acquisition of Alban Towers in 1973. The refinancing was secured by a first mortgage on *71 Alban Towers and was without recourse against Georgetown. In order to obtain this refinancing, Georgetown guaranteed the bank that it would fund all operating deficits of the property and collateralize all budgeted yearly deficits of the property in excess of $200,000. On the previous day, Mr. Smith, Georgetown and Mrs. Dorothy Gambrill, who was the wife of Charles A. Gambrill, [3] executed a Limited Partnership Agreement (hereinafter the partnership agreement) under the laws of the District of Columbia and formed the Alban Towers Limited Partnership (hereinafter the partnership). The partnership agreement provided for a retroactive effective date of July 1, 1975. When the partnership agreement was executed, the loss from the operating of Alban Towers already had totaled $254,735 for the period July 1, 1975 to December 31, 1975. [4]
The partnership agreement provided that the limited partners were to contribute a total of $300,000, which was to be paid in annual $60,000 installments over a 5-year period, in return for an 80-percent interest in the partnership. Georgetown was *72 to transfer Alban Towers [5] to the partnership in exchange for: (1) a credit to its capital acount in the amount of $75,000; [6] *73 (2) the partnership's obligation to Georgetown in the amount of $2,771,730, [6] and (3) a 20-percent general partnership interest in the pertnership. The allocation of partnership interests was not based upon the relative amounts contributed, but rather was based upon a mathematical formula under which Georgetown's share of the partnership's losses would be offset on paper by the interest payable on both the partnership's $2,771,730 note to Georgetown and the operating loans Georgetown made to the partnership. The specifics of the note and operating loans are discussed below. The partnership's $2,771,730 indebtedness to Georgetown was evidenced by a partnership note, which was executed and delivered in January of 1976. The note provided that payment of the principal was due in one installment on July 1, 1985 and interest was payable annually at a floating rate. Both the promissory note and the partnership agreement provided that, if the partnership lacked sufficient cash flow to make a cash payment of interest on the note for any year, the interest was to be treated as paid by the partnership to Georgetown followed by the immediate contribution of such amount to the capital of the partnership. Appropriate adjustments were to be made to Georgetown's capital account to reflect this deemed contribution. During the years 1975 through 1979, the partnership, which was an accrual basis taxpayer, accrued interest on the $2,771,730 indebtedness in the total amount of $1,255,378.28, all of which was treated a paid by crediting Georgetown's capital account. The partnership agreement also required Georgetown to insure that loans could be obtained by the partnership *74 if it needed funds to cover operating deficits. Loans made by Georgetown (hereinafter the operating loans) were to bear interest at prevailing rates, with the principal on such loans being due 10 years from the date of the respective loans' execution. During the years 1976 through 1979, Georgetown made operating loans to the partnership in the total amount of $928,859. The accrued, but unpaid, interest on these loans totaled $163,314.76 during this period. In addition, the partnership agreement had a provision that gave Georgetown the right to elect to redevelop Alban Towers. If Georgetown exercised this right, it would be deemed to have contributed the $2,771,730 note, adjusted for inflation, together with all the accrued, but unpaid, interest thereon to the capital of the partnership. Furthermoe, Georgetown could make a capital call on the limited partners. The amount of the capital call was designed to bring the limited partners' aggregate capital contributions to 49/51 of Georgetown's aggregate capital contributions. Georgetown's interest in the partnership would thus increase to 51 percent and the limited partners' interest would decrease to 49 percent. If the limited partners *75 failed to meet the capital call, they would forfeit their respective interests. Until the decision to redevelop was made by Georgetown, no substantial contributions were to be made by the limited partners. Despite the formation of the partnership, Georgetown continued to manage and make all decisions with respect to Alban Towers. Tradesmen dealing with Alban Towers dealt with Georgetown and were paid by Georgetown vouchers as the partnership did not have an accounting system. All expenses incurred from the operation of Alban Towers were run through Georgetown's accounting system and paid with the University's checks, except mortgage interest which was paid with a partnership check. With respect to the mortgage interest expense, Georgetown would transfer the funds necessary to cover this amount to the partnership's checking account and the partnership would then write the partnership check. Very little money was kept in the partnership's checking account. During the years in issue, all student and commercial leases pertaining to Alban Towers were entered into by Georgetown, as the lessor. In fact, the landlord registration form dated April 21, 1978, which was filed with the District *76 of Columbia Rental Accommodations Office, listed Georgetown as the owner of Alban Towers, and Georgetown took appropriate legal action against tenants who violated their lease agreements. Furthermore, all licenses, insurance and filed personal and real property tax returns relating to Alban Towers were also in Georgetown's name. None of the above mentioned documents disclosed the partnership. Alban Towers continued to operate at a loss for each taxable year after the partnership's formation, and the partnership reported losses through 1982 in the total amount of $6,998,400. [7] Thus, at all times, the partnership could not have covered Alban Towers' losses without the infusions of money from Georgetown. OPINION The primary issue before us is whether the partnership was the owner and operator of Alban Towers for Federal income tax purposes. Resolution of this issue will determine whether respondent properly disallowed petitioners-limited partners' distributive shares of the losses generated from the property's operation, which petitioners had deducted pursuant *77 to section 702[8] and sec. 1.702-1, Income Tax Regs.
Petitioners contend that Georgetown sold Alban Towers to the partnership. Thus, they argue that the partnership was the owner and operator of the property and they were entitled to deduct their distributive shares of the losses generated from its operations. Respondent maintains that Georgetown retained the benefits and burdens of ownership and did not transfer Alban Towers to the partnership. Alternatively, respondent argues that the partnership was an activity not engaged in for profit under section 183 and that the allocation of 80 percent of the partnership's income, losses, deductions and credits was a special allocation that lacked substantial economic effect within the meaning of section 704(b). For reasons set forth below, we need not address respondent's alternative arguments. The law is clear that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. Gregory v. Helvering,293 U.S. 465 (1935); Houchins v. Commissioner,79 T.C. 570, 589 (1982). *78 As such, we are not necessarily concerned with the labels, semantic technicalities and formal written documents employed by the parties. Frank Lyon Co. v. United States,435 U.S. 561, 573 (1978). While it is true that a taxpayer has the right to reduce his taxes by any means available under the law, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering,supra at 469. This principal was summarized in Frank Lyon Co. v. United States, supra at 572-573 where the Supreme Court stated: This Court, almost 50 years ago, observed that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed--the actual benefit for which the tax is paid." Corliss v. Bowers,281 U.S. 376, 378 (1930). In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. E.g., Commissioner v. Sunnen,333 U.S. 591 (1948); Helvering v. Clifford,309 U.S. 331 (1940). In applying *79 this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," Commissioner v. Tower,327 U.S. 280, 291 (1946), as controlling for tax purposes when the objective economic realities are to the contrary."In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co., 308 U.S. at 255. See also Commissioner v. P.G. Lake, Inc.,356 U.S. 260, 266-267 (1958); Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945).Nor is the parties' desire to achieve a particular tax result necessarily relevant. Commissioner v. Duberstein,363 U.S. 278, 286 (1960). With these fundamental precepts in mind, we proceeds to examine the transaction in the instant case to determine whether the partnership was the owner of Alban Towners.
For Federal income tax purposes, the term "sale" is given its ordinary meaning and is generally defined as a transfer of property for money or a promise to pay money. *80 Commissioner v. Brown,380 U.S. 563, 570-571 (1965). Whether a sale has occurred depends upon whether there has been a transfer of the benefits and burdens of ownership.This determination is factual and must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). In Grodt & McKay Realty, Inc.,supra at 1237-1238, the Court stated that some of the factors, among others, to consider in making this determination are: (1) whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser bears the risk of loss or damages to the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; and (5) whether the purchaser acquired any equity in the property. Upon considering these criteria and others, we have no hesitancy in holding that the benefits and burdens of ownership of Alban Towers were not transferred to the partnership. Record title to Alban Towers was not transferred to the partnership. Although Georgetown executed a Declaration *81 of Beneficial Ownership that described Georgetown as holding legal title to the property for the benefit of the partnership, the declaration was not filed because it would have clouded Georgetown's recorded title of Alban Towers. The manner in which the parties treated the transaction demonstrates that all of the attributes of ownership were retained by Georgetown. The limited partners did not make any effort to restrict or relieve Georgetown of its control over Alban Tower's operation as a dormitory. Georgetown made all decisions with respect to Alban Towers and its operations, including, but not limited to, the right to sell, mortgage, convey and refinance the property. All licenses, insurance and filed personal and real property tax returns relating to Alban Towers were in Georgetown's name, without disclosure of the partnership. Tradesmen dealing with Alban Towers dealt with Georgetown. Furthermore, all expenses incurred from the operation of Alban Towers were paid by Georgetown and run through its accounting system, [9] as the partnership did not have an accounting system. With the exception of the $300,000 paid by the limited partners, Georgetown funded the entire operating *82 deficits of Alban Towers. The partnership could not have covered Alban Towers' losses without such funding from Georgetown. In addition, During all the years in issue, all student and commercial leases pertaining to Alban Towers were entered into by Georgetown as the lessor, without disclosure of the partnership. In fact, the landlord registration form listed Georgetown as the owner of Alban Towers and Georgetown took appropriate legal action against tenants who violated their lease agreements. With respect to which party bore the risk of loss or damage to the property, the fact that Georgetown procured the insurance on Alban Towers and funded the operating deficits argues that Georgetown, and not the partnership, bore the risk of loss or damage. In analyzing this particular factor, we also found relevant the fact, previously noted, that all student and commercial leases pertaining to Alban Towers were entered into by Georgetown, *83 not the partnership, and that Georgetown took appropriate legal action against tenants who violated their lease agreements.This further convinces us that Georgetown was the party that bore the risk of loss or damage with respect to Alban Towers. Petitioners argue that the reason the student leases were entered into in Georgetown's name was to facilitate the collection of rent in the event of default, since the obligation would then be transferred to a student's account and transcripts or diplomas could be withheld. While petitioners' explanation of why the student leases were in Georgetown's name seems plausible, it does not explain adequately why all the other documents executed with respect to Alban Towers' operation only mentioned Georgetown and failed to disclose the partnership. With respect to the factor of control, petitioners maintain that, while Georgetown retained operating control of the property in its capacity as general partner, Georgetown's control was not unrestricted. They argue that the limited partners, Mr. Smith, James Meers and John M. Gambrill, [10] were experts in the partnership's affairs, which included participating in negotiations with respect to the possible *84 sale and/or redevelopment of Alban Towers. Thus, petitioners insists that they have always been in a position to influence the operations of the partnership. Petitioners' assertion that the limited partners exercised influence over Georgetown's operation of Alban Towers is simply not supported by the record. Despite the fact that Alban Towers constantly operated at a loss, no real efforts were made to change management. Mr. Smith testified that, at one point, a suggestion was made to have a management company assume the responsibility of operating Alban Towers, but Georgetown rejected it. Furthermore, at all relevant times, Georgetown needed Alban Towers to alleviate a critical housing shortage. As such, Georgetown was never in a position to consider, and in some cases took steps to discourage, any proposals to sell and/or redevelop Alban Towers, unless the proposal provided for alternate student housing facilities. We find it interesting that the limited partners, who purportedly held an 80-percent majority partnership interest, had no say in not only how Alban Towers was managed, but also in whether or not proposals involving *85 the property should be seriously considered. Instead, Georgetown, which purportedly held only a 20-percent minority partnership interest, had absolute veto power over all decisions with respect to Alban Towers. As such, the property continued to be used to house students, even though its conversion, such as into condominiums, would have provided a better and more profitable investment from an economic standpoint to the limited partners. Thus, it is obvious that Georgetown, and not the partnership, incurred the benefits and burdens associated with ownership of Alban Towers. With respect to the factor of equity, petitioners rely on Dunlap v. Commissioner,74 T.C. 1377 (1980), revd. on another issue, 670 F.2d 785 (8th Cir. 1982), as support for their contention that the partnership acquired an equity interest in the property and should be treated as the owner and operator for Federal income tax purposes. In Dunlap v. Commissioner,supra at 1400-1415, 1431-1437, Safeway Stores, Inc. (Safeway) designed and built an integrated division office, a warehouse, and a distribution center on approximately 60 acres of land in El Paso, Texas. Safeway then conveyed its interest in the property *86 to El Paso Properties, Corp. for $8,800,000. El Paso Properties, Corp. was a single-purpose financing corporation that was formed to acquire title to the property, to secure financing of the purchase price of the property, to arrange a leaseback of the property to Safeway, and to transfer title of the property and the lease agreements to individual investors. The purchase price was raised by the subscriptions of eight individual investors, including the taxpayer, totaling $387,000 in cash and by El Paso Properties, Corp. placing $8,413,000 of secured notes with various institutional investors. The taxpayer claimed a deduction for his share of depreciation in the property. Respondent disallowed the deduction on the basis that the transaction was not a valid sale-leaseback, maintaining that the taxpayer, and the other individuals, entered into the transaction for the purpose of creating artificial tax losses and that Safeway, and not the eight individual investors, was the owner and operator of the property. Since respondent had raised this issue in his amended answer, he had the burden of proof. The Court upheld the transaction on the basis that respondent failed to carry his burden *87 of proof and not on the basis that the taxpayer had established that a valid sale-leaseback transaction had been entered into. Thus, petitioners' reliance on Dunlap is misplaced because, in the instant case, it is petitioners and not respondent upon whom the burden of proof lies. Furthermore, Dunlap involved a three-party transaction whereas the instant case involved a two-party transaction between Georgetown, a tax-exempt organization, and the partnership. In addition, Georgetown purportedly sold its interest in Alban Towers to a partnership in which it was the sole general partner. As general partner, Georgetown has substantial control over the partnership's operations. The interrelationship between the parties in the instant case was not present in Dunlap, and careful scrutiny of the transaction is required where such an interrelationship exists. See Charles Schneider & Co. v. Commissioner,500 F.2d 148, 152 (8th Cir. 1974); Electric & Neon Inc. v. Commissioner,56 T.C. 1324, 1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974); Roschuni v. Comissioner,29 T.C. 1193, 1202 (1958), affd. 271 F.2d 267 (5th Cir. 1959). [11] Our careful analysis of the record *88 convinces us that petitioners did not acquire an equity interest in Alban Towers. The fact that the limited partners paid a total of $300,000 does not change the fact that they did not acquire an equity interest in the property. At most, this amount represented the option price paid by the limited partners to obtain the right to participate in the redevelopment of Alban Towers. [12] *89 See Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976). If the limited partners decided not to exercise their option upon redevelopment, they would lose their $300,000 investment and Georgetown would retain its complete ownership of the property. However, the limited partners would have more than recouped their losses through tax savings, making them net cash winners. We also disagree with petitioners' contention that the facts of Masoni v. Commissioner,T.C. Memo. 1968-129, are comparable to those in the instant case. In Masoni, a corporation subleased a recetrack that it had previously operated at a loss to a partnership, the partners of which were composed of the corporation and its majority shareholders. Formation of this partnership was necessary because additional funds were needed to maintain the operation of the racetrack and some of the corporation's majority shareholders had refused to lend the corporation the necessary funds because of its limited liability. These shareholders did, however, agree to lend the funds if a partnership were formed to operate the racetrack, since the other partners would be personally liable on the loans. The partnership operated the racetrack and the partners claimed their *90 respective shares of the losses generated from its operation. Respondent disallowed the claimed losses on the ground that the partnership was merely a tax-avoidance device and that the corporation, rather than the partnership, operated the track. The Court disagreed and upheld the claimed losses. The Court found that the partnership operated the racetrack, despite the fact that, as a matter of convenience, the license to operate the track remained in the corproation's name and the corporation continued to handle the payroll and file Federal and state withholding tax returns. We find that the facts in the instant case are distinguishable from those in Masoni. The partnership in the instant caes, unlike the one in Masoni, did not have an independent accounting system. Thus, all transactions continued to be handled by Georgetown's accounting system. [13] In addition, the partners in Masoni, who were also the majority shareholders of the corporation, participated in the racetrack's operation. In the instant case, the evidence failed to support petitioners' self-serving testimony that the limited partners took an active role in the operation of Alban Towers. Furthermore, no *91 valid business reasons were served by Georgetown's purported joint venture with petitioners. Contrary to petitioners' assertions that petitioners-limited partners were needed to provide real estate expertise and assist Georgetown in securing financing, the record does not establish that such expertise was truly desired or obtained. We also find it incredible that Georgetown would relinquish 80 percent of its interest in Alban Towers in exchange for such expertise and an insubstantial amount of cash, given the fact that such expertise, it truly desired, could have been obtained by Georgetown from outside consultants. Actually, we find the argument rather contrived, possibly an afterthought. Finally, while Mr. Smith did assist Georgetown in refinancing $4 million of its Chase Manhattan Bank loan that had been incurred in Georgetown's acquisition of Alban Towers in 1973, the record does not indicate that such assistance was necessary. There is every reason to believe that Chase Manhattan Bank would have refinanced the loan in any event, since the refinancing was secured by the property, whose value was in excess of the loan amount. [14] *92 Our finding that Alban Towers was not, in reality, sold to the partnership is further buttressed by the fact that the purported sale was for an amount equal to Georgetown's purchase price for the property two years earlier plus its actual cost of making renovations. There was no evidence that this amount reflected the property's fair market value. Petitioners, on brief, even admitted that the sales price may well have been less than the real value of the property. Furthermore, no actual payments of principal or interest were made on the purported $2,771.730 note and operating loans executed between the partnership and Georgetown and, we infer, were never intended to be made as the partnership had no funds with which to make any such payments. The purpose of these purported debts was to create on paper sufficient interest income to offset Georgetown's losses from its operation of Alban Towers, which *93 losses Georgetown had funded prior to the partnership's formation and continued to fund afterwards. It is clear from the record that Georgetown did not have any intention of selling Alban Towers, but rather desired to label its losses from the operation of Alban Towers on its financial reports as investments and loans. While such labeling did not affect Georgetown's real dollar losses, [15]Georgetown believed it could obtain greater contributions as its contributors wanted to endow the university, not underwrite deficits. Respondent also determined that petitioners James and Florence Meers are liable for an addition to tax as provided in section 6651(a)(1). [16]Section 6651(a)(1) provides for an addition to tax for failure to file a return when it is due "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Petitioner has the burden of proof with respect to this issue. Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1342 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974); Fischer v. Commissioner,50 T.C. 164, 177 (1968); *94 Bebb v. Commissioner,36 T.C. 170, 173 (1961). Section 301.6651-1(c)(1), Proced. & Admin. Regs., provides in part-- If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. * * * The Internal Revenue Service granted petitioners James and Florence Meers an extension of time for filing their 1978 Federal income tax return until November 16, 1979. They filed the return on January 12, 1981. Petitioner James Meers testified that he kept the records with respect to his 1978 tax return at his place of business, that these records were inadvertently thrown away in 1979, and that he had a difficult time getting the duplicate records necessary to file the return on time. The record does not establish when in 1979 the records were thrown away. *95 Even if they had been thrown away prior to the filing deadline, the evidence is insufficient to show that the filing of their 1978 Federal income tax return some 14 months after the extension of time expired was due to reasonable cause. Decisions will be entered under Rule 155.
Appendix A Docket
Tax
Addition under
Residence when
Petitioner *
No.
Year
Deficiency
sec. 6651(a)(1)
petition filed
Harry J. Smith,
17763-83
1975
$55,620
Harwood, Md.
Jr. and Norma
1976
125,647
D. Smith
30325-81
1977
517,662
$51,766
Washington, D.C.
12795-82
1978
11,129
Harwood, Md.
1979
221,289
James Meers and
11570-82
1977
53,647
2,682
Bethesda, Md.
Florence Meers
1978
34,248
8,562
1979
7,306
Charles A.
11571-82
1978
11,368
Ft. Lauderdale,
Gambrill, Jr.
1979
10,718
Fla.
John M. Gambrill
11571-82
1978
10,832
Solomons, Md.
1979
7,127
Monica C. Gambrill
11571-82
1978
11,243
Mexico 20 D.F.,
1979
12,848
Mexico
Peter R. Gambrill
11571-82
1978
11,336
Alexandria, Va.
1979
4,638
Richard J.
11571-82
1978
10,832
Arlington, Va.
Gambrill
1979
11,248
Stephen F.
11571-82
1978
10,795
Solomons, Md.
Gambrill
1979
9,508
Petitioner *
Docket No.
Tax Year
Deficiency
Trust for the Benefit of: **
Charles Gambrill, Jr.
11569-82
1977
$3,311
John M. Gambrill
11569-82
1977
3,311
Monica C. Gambrill
11569-82
1977
3,311
Peter R. Gambrill
11569-82
1977
3,311
Richard J. Gambrill
11569-82
1977
3,311
Stephen Gambrill
11569-82
1977
3,311
*96 Footnotes
1. For a complete list of the petitioners in this case, see Appendix A.↩
2. This critical housing shortage continued throughout all the taxable years in issue.↩
3. Dorothy Gambrill and Charles A. Gambrill subsequently divorced. ↩
4. The partnership was a calendar-year taxpayer.↩
5. On Feb. 17, 1976, Georgetown executed a Declaration of Beneficial Ownership, which described Georgetown as holding legal title to Alban Towers for the benefit of the partnership. However, the Declaration of Beneficial Ownership was not filed because it would have clouded Georgetown's recorded title of Alban Towers. ↩
6. These amounts total $2,846,730 and represent the difference between $6,846,730, which was Georgetown's undepreciated original cost plus the cost it incurred to physically renovate, remodel and improve Alban Towers, less the property's $4 million encumbrance to Chase Manhattan Bank.
7. By 1981, all the limited partners had taken losses on their respective tax returns to the full extent of their respective bases.↩
8. Unless, otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
9. We note that while mortgage interest was disbursed by partnership check, it was in actuality paid by Georgetown.Georgetown transferred the funds necessary to cover this expense to the partnership's checking account and the partnership then paid the expense.↩
10. John M. Gambrill is the son of Charles A. Gambrill.↩
11. See also General Roofing and Insulation Co. v. Commissioner,T.C. Memo. 1981-667; Ahlegian v. Commissioner,T.C. Memo. 1975-342, affd. 556 F.2d 580 (6th Cir. 1977); Big "D" Development Corp. v. Commissioner,T.C. Memo. 1971-148, affd. per curiam 453 F.2d 1365↩ (5th Cir. 1972). 12. The partnership agreement provided Georgetown with complete power to determine when to redevelop once 5 years had elapsed. Prior to the expiration of 5 years, such decision required approval of a majority of the limited partners. It is interesting to note that, during this 5-year restriction on Georgetown's redevelopment rights, the limited partners took losses on their respective tax returns to the full extent of their respective bases.
13. See n. 9.↩
14. We note that petitioners contend that the partnership, and not Georgetown, obtained the $4 million loan from Chase Manhattan Bank that was secured by Alban Towers. In light of our holding that Georgetown, and not the partnership, retained the benefits and burdens associated with ownership of Alban Towers, we need not address this contention.
15. It should be mentioned that Georgetown's outlay of funds was slightly reduced by the payments totaling $300,000 from the limited partners.↩
16. Respondent made this determination for their 1977 and 1978 taxable years. Petitioners James and Florence Meers concede the applicability of the addition to tax for 1977. Respondent also made this determination with respect to petitioners Harry J. and Norma D. Smith's 1977 taxable year and such determination was also conceded.↩
*. All petitioners, except Charles A. Gambrill, Jr., filed their respective income tax returns with the Internal Revenue Service Center in Philadelphia, Pennsylvania. Charles A. Gambrill, Jr. filed his income tax return with the Service Center in Atlanta, Georgia. ** Mr. Elmo H. Denton and Mr. H. M. Ammerman are the trustees of each respective trust. In their capacity as trustees, they are the petitioners in docket No. 11569-82.The principal office and residence of each of the Gambrill trusts is Washington, D.C.↩